2015 IL App (1st) 131144
Fifth Division
June 30, 2015

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 10 CR 2330 |
| v. | ) ) | The Honorable |
| RASHAUN CARLISLE, | ) ) ) | Carol A. Kipperman, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant was found guilty by a jury of five counts of attempted first degree murder, one count of aggravated battery with a firearm, and one count of aggravated discharge of a firearm after he used a sawed-off shotgun to shoot police officer Robert Vicari and shot at police officer Terry Carr in Stone Park, Illinois. 720 ILCS 5/9-1(a)(1) (West 2008); 720 ILCS 5/12-4.2(a)(1) (West 2010); 720 ILCS 5/24-1.2(a)(3) (West 2010). After hearing arguments in aggravation and mitigation, defendant was sentenced to 60 years with the Illinois Department of Corrections (IDOC) for five counts of attempted first degree murder.

¶ 2          On this direct appeal, defendant claims that: (1) the trial court erred by barring the testimony of expert witness Donald Mastrianni, a gun store owner whose testimony would have helped establish defendant's intent; (2) defendant received ineffective assistance of counsel because defense counsel failed to lay a proper foundation to introduce into evidence a supplementary investigation report from Detective Christopher Pavini, which defendant claims would have impeached the testimonies of Vicari and Carr, and supported defendant's claim as to his intent, and; (3) the mittimus should be corrected to reflect only two counts of attempted first degree murder, and the counts of aggravated battery with a firearm and aggravated discharge of a firearm should be merged into the two counts of attempted first degree murder. At to the last point, the State agrees and the mittimus is corrected accordingly.

¶ 3          Defendant's five counts of attempted first degree murder derive from two single acts, and they must be reduced to two counts of attempted first degree murder pursuant to the one-act, one-crime rule. *People v. King*, 66 Ill. 2d 551, 566 (1977). Further, pursuant to the oral pronouncement given by the trial court, defendant's counts for aggravated battery with a firearm and aggravated discharge of a firearm are merged into the two counts of attempted first degree murder. Thus, the mittimus should reflect only two counts of attempted first degree murder and is corrected accordingly.

¶ 4          For the following reasons, we do not find persuasive defendant's claims: (1) that the trial court erred in barring the testimony of Donald Mastrianni; and (2) that the denial to enter into evidence Carr's and Vicari's previous statements to Detective Christopher Pavini was error and prejudiced defendant. We affirm.

¶ 5                                    BACKGROUND

¶ 6        We provide a detailed description of the testimony below, but in sum, the State's evidence at trial established that on May 8, 2010, at 2:50 a.m., defendant stood on the median strip of Mannheim Road near Division Street in Stone Park, Illinois, and fired two rounds from a sawed-off shotgun at police officers Robert Vicari and Terry Carr, who were called to investigate a disturbance. Officer Vicari was wounded in the face and shoulder, and Officer Carr was not injured. Defendant fled the scene and was subsequently apprehended.

¶ 7                                  I. Pretrial Motions

¶ 8        Before trial, the trial court allowed Donald Mastrianni, the owner of Illinois Gun Works and a certified instructor of firearm and gun safety classes, to examine the sawed-off shotgun used by defendant. Based on Mastrianni's visual inspection and firing of the sawed-off shotgun and measurements of the crime scene, Mastrianni was prepared to opine that the shotgun was not deadly at the distance from which it was fired.

¶ 9        On March 8, 2012, the State sought to bar his testimony, and the court held a hearing on the admissibility of his expert opinions. The State argued that, pursuant to Illinois case law,[1] the State would not be required to prove that a gun is a deadly weapon. The State argued that, because a gun is a *per se* deadly weapon, there was no reason for defense counsel to call an expert witness who would opine that the shotgun was not a *per se* deadly weapon from a certain distance. Defense counsel agreed that a sawed-off shotgun was a *per se* deadly weapon; however, "[w]hat our expert would testify to is that [the sawed-off shotgun is] old and the distance from which it was fired, it is not deadly." Defense counsel and the State then engaged in the following exchange:

---

[1] The case cited by the State is *People v. Merritt*, 367 Ill. 521 (1937).

"DEFENSE COUNSEL: *** I think the gun, the sawed-off shotgun from the distance we're all here, clearly it's deadly, but that's not what's being done here. And [defendant] he's certainly no firearm expert. He can have some knowledge of the gun. He knows what it can do. He could testify what he thought it could do from the distance that he fired it. That's for the trier of fact. But the expert could bolster, reinforce, that indeed what [defendant's] perception was was true. And that's what we want to do.

THE STATE: Judge, and my argument is that's exactly what Counsel is trying to do, is get in through the back door the argument that his client didn't intend to kill. This would prelude or at least allow Counsel to not put his client on the stand to testify to what this defendant's intent was that night. That's totally improper, Judge. That would be an improper purpose for the expert to come in and testify as to this defendant's intent when he fired that sawed-off shotgun at Officer Vicari."

¶ 10    The trial court barred the expert testimony, finding as a matter of law, a gun is considered a deadly weapon. On February 20, 2013, after jury selection, defense counsel renewed his motion to allow the testimony of Mastrianni, which was denied.

¶ 11                                    II. Evidence at Trial

¶ 12    The State's evidence consisted of the testimony of eight witnesses: (1) a Stone Park police officer, Andrew Morales, who observed the shooting; (2) a Stone Park police officer, Robert Vicari, who was shot by defendant; (3) a Stone Park police officer, Terry Carr, Officer Vicari's partner; (4) a Cook County sheriff's police officer, Sergeant Melvin Jenkins, who observed the shooting; (5) a Franklin Park police officer, Sergeant Michael Jones, the arresting officer; (6) Mark Pomerance, a forensic scientist who analyzed the shotgun used by

defendant; (7) a Stone Park police detective, Christopher Pavini, who investigated the shooting; and (8) as assistant State's Attorney (ASA), who interviewed defendant.

¶ 13                                    A. Officer Andrew Morales

¶ 14            Police Officer Andrew Morales testified that at 2 a.m. on May 8, 2010, he was on patrol when he responded to a call to close a bar located in a strip mall on North Mannheim Road in Stone Park, Illinois, in response to complaints of gang activity. Morales was in uniform and was driving a marked police Ford Expedition. Morales was familiar with the bar as a frequent "hang out" location for the Latin Kings. Morales, joined by a number of other police officers at the strip mall, closed down the bar. The patrons of the bar were compliant with the officers' requests to vacate the premises, and the patrons promptly exited the bar and the bar's parking lot.

¶ 15            Morales then entered a liquor store located in the same strip mall to discuss nearby traffic issues with the liquor store clerk. An unidentified male entered the liquor store and complained that he was being harassed by an individual in front of the bar. At this time, the other officers involved in closing the bar had vacated the strip mall. However, Officer Carr and Officer Vicari arrived shortly at the liquor store, and Morales instructed them to investigate the disturbance in front of the bar. Carr and Vicari were dressed in "plain clothes," but they wore bulletproof vests outside of their clothes, with their police badges showing, and belts containing their firearms, handcuffs, and other equipment. They were driving an unmarked police Chevy Malibu.

¶ 16            Morales observed Carr and Vicari handcuff an individual who was shouting outside the bar. Morales was standing outside of the liquor store, approximately 100 feet away from Carr and Vicari, when he heard two gunshots. Morales observed an individual standing in the

median strip of Mannheim Road pointing a shotgun at Carr and Vicari,[2] who, besides the individual they had handcuffed, were the only people in the parking lot. Officer Morales returned the fire at the individual in the road, who promptly fled. Morales gave pursuit but did not apprehend the individual. Upon returning to the parking lot, Morales observed Vicari bleeding from his face.

¶ 17    Morales testified, on cross-examination, that when he exited the liquor store the individual creating the disturbance was yelling but that there was no one else in the parking lot. He further testified that his marked vehicle was in front of the liquor store and that neither of the two police vehicles in the strip mall parking lot had its mars lights flashing. On redirect, Morales identified the sawed-off shotgun that the individual in the median of the street was holding. This exhibit was later admitted into evidence without objection.

¶ 18                            B. Officer Robert Vicari

¶ 19    Police officer Robert Vicari testified that, on May 8, 2010, at 2 a.m., he received a call to proceed with his partner, Officer Terry Carr, to close down the bar on Mannheim Road in response to gang activity at the bar. Vicari's and Carr's bulletproof vests had the word "Police" written on the back, and the parking lot of the bar was well lit. After the bar and its parking lot were cleared, Vicari and Carr drove to a garage behind the bar to investigate a report of gang graffiti sprayed on the garage. After observing the graffiti, the two officers drove to the front of the strip mall, where Officer Morales directed Vicari and Carr to return to the bar, where an individual was causing a disturbance. The individual was intoxicated, agitated, and had apparently been arguing previously with "some other unknown male subject." Vicari handcuffed the individual for the officers' safety and began patting

---

[2] Officer Morales later identified this individual as defendant.

down the individual. Vicari then heard a gunshot, took cover, drew his firearm and rose to return fire. Observing an individual in the median of Mannheim Road, about 60 feet away, he fired a second shot and then returned to cover. At this point the handcuffed individual informed Vicari that Vicari had been shot in the face. Vicari then called on his radio that there was an officer shot and a Hispanic male suspect with a black hoodie, blue jeans, and a sawed-off shotgun was heading eastbound from Mannheim Road.[3] Vicari testified that he still had five pellets in his face and one in his shoulder, and that doctors cannot remove the two pellets remaining in his left eye due to fear that the surgery could result in blindness.

¶ 20     On cross-examination, Vicari testified that, after the bar was cleared out, the only person left in the parking lot was the individual creating the disturbance. Vicari testified that before May 8, 2010, he did not know defendant and knew of no reason why defendant would be angry with him. Vicari confirmed that he gave a statement to Detective Pavini, and defense counsel then attempted to impeach Vicari, in relevant part as follows:

> "DEFENSE COUNSEL: Do you remember what you told him as to what you saw in front of [the bar]?
>
> OFFICER VICARI: Not verbatim.
>
> DEFENSE COUNSEL: Isn't it true that you told him —
>
> THE STATE: Objection, Judge.
>
> THE COURT: Yes, sustained."

¶ 21     No offer of proof was made by the defense.

¶ 22                                 C. Officer Terry Carr

---

[3] Officer Vicari did not testify on which street the suspect was heading eastbound.

¶ 23    Police officer Terry Carr testified that on May 8, 2010, at 2 a.m., he was partnered with Officer Vicari. Both officers were wearing bulletproof vests with "Police" written on the back; their badges were on the front of the vests, and their duty belts, holding their equipment, were around their waists. Carr confirmed that, after the bar was closed, the parking lot was completely cleared. Carr testified that he and Vicari checked on some graffiti behind the bar and returned, at the behest of Officer Morales, to question an individual causing a disturbance in front of the bar. During the questioning, Carr heard a gunshot and felt glass ricochet around him. The glass was from the windows of the bar, which shattered upon being hit by pellets from the shotgun. Carr took cover, moved to the front of his police vehicle, and then observed a muzzle flash in the median of Mannheim Road. The muzzle flash was pointed directly at the two officers. Carr began to pursue the suspect; however, his pursuit ended when he heard Vicari on the radio reporting that he was shot. Carr then returned to Vicari and radioed that there was a "male black subject" running eastbound from Mannheim Road.

¶ 24    On cross-examination, Carr testified that prior to May 8, 2010, he did not know defendant and knew of no reason why defendant would be angry with him. Defense counsel and Carr then engaged in the following exchange over possible impeachment:

"DEFENSE COUNSEL: On May 11th do you remember giving a statement to Detective Pavini concerning this incident?

OFFICER CARR: No, I did not.

DEFENSE COUNSEL: Pardon me?

OFFICER CARR: May 11th?

DEFENSE COUNSEL: May 11th? [*sic*]

OFFICER CARR: I don't recall.

DEFENSE COUNSEL: Is it possible you gave him this statement?

OFFICE CARR: Very possible.

DEFENSE COUNSEL: Was he a supervisor of yours at the time?

OFFICER CARR: He is the chief detective, correct.

DEFENSE COUNSEL: Do you remember—strike that. No further questions, Judge."

¶ 25                                D. Sergeant Melvin Jenkins

¶ 26        Police sergeant Melvin Jenkins testified that on May 8, 2010, at 2:50 a.m., he was leaving the scene of an arrest and heading northbound on Mannheim Road when he heard a gunshot near the intersection of Mannheim Road and Division Street. As he heard the gunshot he observed a muzzle flash to his left. Jenkins slowed his vehicle and observed a second muzzle flash from the same position as the first muzzle flash. Jenkins observed that the individual shooting the shotgun was pointing the shotgun at "one marked police car, which was behind another unmarked car. But I was able to notice that there were a couple of police officers and what appeared to be a citizen or someone that they had in custody near the back side of a marked vehicle." He did not observe any other individuals in the strip mall parking lot. Jenkins turned on his mars lights and pursued the suspect while using a spotlight to illuminate the area. He drove to 39th Street and exited his vehicle, where a number of other law enforcement agencies arrived to surround the area in which the suspect had fled. Jenkins then received notification over his radio that the suspect was apprehended, and he identified the suspect in custody as the same man he observed fleeing the shooting; however, the suspect was no longer wearing a dark-colored "pullover" (sweatshirt) that he was wearing

during the shooting. Jenkins searched the area and located a dark sweatshirt, which had been "stuffed" into a bush. Jenkins identified defendant as the suspect he observed shooting at Carr and Vicari.

¶ 27     On cross-examination, Jenkins testified that he could not positively state that the gun held by the suspect was pointing directly at the squad cars or officers. He could only testify that the gun was being pointed west and that this was in the same direction where the squad cars and officers were located.

¶ 28                              E. Sergeant Michael Jones

¶ 29     Police sergeant Michael Jones testified that, on May 8, 2010, just before 3 a.m., he was monitoring the radio at the Franklin Park police station. The Franklin Park police department shares a radio band with the Stone Park police department. He received a radio call that a Stone Park officer had been shot, and he and several other officers exited their police station to respond to the radio call. Upon arriving at the intersection of 39th Street and Division Street, Jones joined other officers in searching for the suspect involved in the shooting. Jones observed defendant walking in the area and "looking back" while he was walking. Jones proceeded to take defendant into custody. On cross-examination, Jones testified that he was not at the bar when the shooting occurred and did not observe how many individuals were in the bar parking lot during the shooting.

¶ 30                          F. Firearms Examiner Mark Pomerance

¶ 31     Mark Pomerance, a firearms examiner for the Illinois State Police, Division of Forensic Services, testified that he analyzed the sawed-off shotgun. The shotgun's double-barrel stock was sawed off and the butt of the shotgun had also been shortened. On cross-examination, Pomerance testified that the shotgun was at least 50 years old and that he did

10

remove the pellets from the shells he used during his examination to lessen the recoil of the shotgun. He also testified that he did not have any pellets to compare with and made his conclusion that a size six pellet was used during the shooting because the spent shotgun shells at the crime scene were marked size six.

¶ 32                                G. Detective Christopher Pavini

¶ 33         Police detective Christopher Pavini testified that, on May 8, 2010, at 2:50 a.m., he received a phone call at his home alerting him that an officer had been shot. He proceeded to 40th Street to aid in the search. During the search, Pavini recovered a discarded shotgun, which was then sent to the Illinois State Police in the same condition that it was found. Upon cross-examination, Pavini testified that he wrote a supplementary investigation report. Defense counsel then handed the report to Pavini and the State requested a sidebar. At the sidebar, the following occurred:

> "DEFENSE COUNSEL: Judge, I have a three-page supplementary investigation signed by Detective Pavini under his auspices where he interviewed Morales, Carr and Vicari about the investigation. These were done on it looks like May 11th, May 11th and May 13th.
>
> THE COURT: So there's a page for each one?
>
> DEFENSE COUNSEL: No. There's a paragraph for each one.
>
> And they make statements to Pavini that are very different than the statements they made when they testified. And that's what I want to bring out.
>
> This is—this is the police—that is the product of the police department, Judge. Supplementary investigation.

THE STATE: And I don't question the report, Judge. Here's the problem. All three of those individuals took the stand. None of them were confronted about those statements.

***

DEFENSE COUNSEL: This is important defense material to Mr.—

THE STATE: The importance—

THE COURT: I think it should have been set up properly.

***

THE COURT: Okay. The first statement.

DEFENSE COUNSEL: Talking about Carr's statement, Judge?[4]

THE COURT: Yes.

THE STATE: There's nothing impeaching.

DEFENSE COUNSEL: It's impeachable. It talks about him being in the northbound lane when he saw the muzzle flash. The northbound lanes of Mannheim traffic. That's the inconsistency with his statement.

THE STATE: That isn't an inconsistent statement.

DEFENSE COUNSEL: He said he fired the gun from the median, [the State]. That puts him another 15 feet further.

***

---

[4] Officer's Carr's statement in Detective Pavini's supplementary investigation report stated, in relevant part, "Carr stated the following in summary and not verbatim or in its entirety.*** Offender was in center lane of N/B Mannheim Rd. Carr began to run after offender***."

DEFENSE COUNSEL: And this one talks about to go [*sic*] investigate a large group in front of [the bar].[5]

THE STATE: Again, it's not—

THE STATE: It's not necessarily impeaching, because we don't know if it's the first time he's there or the second time he's there.

***

DEFENSE COUNSEL: Judge, you were giving me a hard time because this was not their report when I tried to go with it with [*sic*] Vicari. This was not Vicari's report.

THE STATE: No. We gave you a hard time because you just started reading from the report without asking him any questions, which is improper.

THE STATE: You didn't lay the right foundation was our opinion, and that was the nature of our objection, that you weren't laying the right foundation to confront them with those—that statement. At least with Officer Vicari. Because with the other two officers you didn't even ask them about that.

THE COURT: He didn't ask him.

DEFENSE COUNSEL: Right. No argument. Well, let me just bring it up with Vicari.

THE STATE: It's still improper.

---

[5] Officer Vicari's statement in Detective Pavini's supplementary investigation report stated, in relevant part, "Vicari stated the following in summary & not verbatim or in its entirety. Vicari stated there was a large group in front of [the bar] which OFC Morales told Vicari and his partner Carr to go check out. Vicari stated he came in contact with [individual creating a disturbance] who was screaming, swearing."

THE STATE: Because we'd have to put Vicari back on the stand. He might be able to explain away why that statement reads the way it does, but never had the opportunity. So you can't now impeach him when he wasn't given the opportunity to explain that statement.

THE STATE: And there's no context.

THE COURT: Yes. You can't do it.

DEFENSE COUNSEL: So I'm not allowed to put this into evidence?

THE COURT: No."

¶ 34    The trial court sustained the State's objection, holding that defense counsel did not establish a foundation to introduce Pavini's report into evidence.

¶ 35                    H. Defendant's Statement

¶ 36    An ASA testified that on May 8, 2010, at 8 a.m., she arrived at the Stone Park police department to interview defendant. She informed defendant that she was an assistant State's Attorney, that she was a lawyer working with the police, and that she did not represent defendant, and she read defendant his *Miranda* rights. She then interviewed defendant and memorialized the interview, with defendant's permission, by writing down what defendant said, having defendant review the statement, and then having defendant sign each page of the statement. The statement was admitted into evidence without objection. The ASA then published the statement to the jury as follows:

"[Defendant] states that on May 8th, 2010, in the early morning hours [his girlfriend] drove him to the liquor store near Mannheim Road and Division in Stone Park, Illinois. [Defendant] states that he is a regular at the liquor store. Meaning that

he goes there a lot, and he knows that the liquor store is open until at least 4:00 o'clock a.m.

[Defendant] states that [his son] was inside the car in a car seat in the back seat when he arrived at the liquor store. [Defendant] states that the liquor store is next door to a nightclub. [Defendant] states that he bought a 40 ounce bottle of Milwaukee's Best Ice Beer from the liquor store.

[Defendant] states that he left the store and walked to his car, which was parked in the liquor store parking lot. As [his girlfriend] pulled out of the parking lot, she took a left onto Division Street in order to drive eastbound to their apartment on 34th Avenue.

As [Defendant] left the parking lot, he saw one guy flash Latin King gang signs from the parking lot of the nightclub. [Defendant] states that when [his wife] stopped at the stop sign on Division the Latin King continued to flash gang signs and yelled Kings.

[Defendant] states that he got out of the car and wanted to talk to the guy man to man because he didn't think he had to be harassed by them, and he didn't have to live like that. Especially because he hadn't done anything.

[Defendant] states that as he spoke with the one guy other cars kept pulling up. Three cars. And about 7 to 15 guys were there. [Defendant] states that he told them that he had a kid in the car and that he lived around there, and didn't a [*sic*] appreciate it, and that he wasn't on that. [*sic*] Meaning he/[defendant] wasn't a gangbanger.

[Defendant] states that, as he spoke with the initial guy, another guy punched him in the side of the face from the side. [Defendant] states that he fell down, and all of

the guys who were male and Hispanic kicked him and stomped on him when he was on the ground.

[Defendant] states that all of the guys left, and he got back into the car and drove home with [his girlfriend]. [Defendant] states that it took them five minutes to get home. [Defendant] states that he was upset when he got home. [Defendant] states that he was mad that he got jumped by the Latin Kings.

[Defendant] states that he had a 12 gauge sawed off shotgun in his closet that he bought a couple years ago for $100. [Defendant] states that the shotgun was loaded with two rounds shotgun shells. [*sic*] [Defendant] states that he also had other shotgun shells in the closet, and that he put two additional shotgun shells in his pocket.

[Defendant] states that he was mad about what happened and walked back to the nightclub. [His girlfriend] tried to calm [defendant] down after [defendant] grabbed the shotgun. [Defendant] states that he wanted to shoot or hurt them because they, the Latin Kings, beat him up for no reason.

[Defendant] states that he walked from his house to Mannheim Road where the nightclub was with the loaded shotgun, which was about eight blocks. As [defendant] walked toward Mannheim Road, he cut through a parking lot and was walking east to west.

[Defendant] states that he stood in the northbound lane of Mannheim Road when he saw the guys who jumped him. [Defendant] states that he knew it was them and that he immediately recognized them.

[Defendant] states that the Latin Kings were in the nightclub parking lot and that there were at least seven Latin Kings in the lot near several cars along with other

people. [Defendant] states that as he stood near the median in the northbound lane of Mannheim Road he fired the shotgun two times and squeezed the trigger two times at the Latin Kings in the parking lot.

[Defendant] states that he aimed the shotgun at the crowd of Latin Kings. [Defendant] states that after he fired the two shots he ran back in the direction he came from, eastbound through the parking lot along Division Street toward 40th street.

[Defendant] states that he threw the shotgun under some bushes as he ran away and then took off the black hoodie he was wearing and threw it on the ground as he ran."

¶ 37                                         I. Defendant's Wife

¶ 38             The State then rested its case. Defense counsel moved for a directed verdict, which was denied. The defense's case consisted of two witnesses: (1) Guadalupe Vazquez, defendant's the girlfriend and currently his wife, and (2) defendant.

¶ 39             Guadalupe Vazquez testified that on May 8, 2010, at 1 a.m., Vazquez, defendant, and their son were returning from "downtown" when they stopped at a liquor store in a strip mall on Mannheim Road. Defendant went into the liquor store and made a purchase. As they were exiting the strip mall in their vehicle, defendant asked Vazquez to stop the vehicle. He then exited the vehicle and began speaking to two Hispanic males. A van arrived and "eight to ten guys" attacked defendant. Vazquez shifted her vehicle to drive and "proceeded to act like [she] was going to hit them." The attackers then fled. Vazquez drove defendant, herself, and their son back to their apartment, making a short stop to purchase cigarettes. Once they had arrived at their apartment, Vazquez put their child in his crib and defendant cleaned himself.

Defendant then left the apartment, appearing upset but he did not express any anger toward the police.

¶ 40    On cross-examination, Vazquez testified that the liquor store where defendant purchased alcohol was in the same strip mall where the bar is located. Vazquez testified that the apartment she shared with defendant was eight blocks from the strip mall. She further testified that defendant did take his shotgun before exiting their apartment. Vazquez denied telling detectives in the morning of May 8, 2010, that she was unaware that defendant owned a gun. Vazquez also testified that there is a police station across the street from the strip mall but that she and defendant did not go to the police station to report the attack on defendant because her "instinct was to go home. That's where [she] felt safe."

¶ 41                           J. Defendant

¶ 42    Defendant testified that, on May 8, 2010, at 1 a.m., he, Vazquez, and their son were driving home from "downtown" when they stopped at a liquor store in a strip mall on Mannheim Road. Defendant went into the liquor store and then entered the vehicle with Vazquez and their son, and Vazquez began to drive them to their apartment. As they were exiting the parking lot, defendant observed "a few Latino guys" flashing gang signs at their vehicle. Defendant asked Vazquez to stop the vehicle. Defendant then approached the individuals flashing gang signs because he wanted them to know that he and his family lived in the neighborhood and did not "want any problems." As defendant was talking to these men, more and more men began to gather around him. Then a van arrived; at least one person exited the van and everyone around defendant began to beat him. There were at least eight or nine attackers. Vazquez shifted her vehicle into drive and the attackers "scattered." Once

defendant, Vazquez, and their son arrived back at their apartment, defendant washed himself and took his shotgun. Defendant believed that the shotgun was a "close range weapon."

¶ 43 Defendant testified that he walked back to the strip mall and stood in the second lane of the northbound lanes of Mannheim, but he did not reach the median before firing both shots from his shotgun. Defendant testified that there were four lanes of traffic between where he fired his shotgun and the corner of the strip mall where the defendant was pointing his shotgun. Defendant testified that he was shooting at the men who had previously attacked him, who were standing in the same area where they had attacked him. Defendant testified that he only intended to frighten these men, in retaliation for the fear they had created. Defendant did not observe any police officers or police vehicles in the parking lot. After firing the shotgun, defendant ran away and was subsequently apprehended. Defendant further testified that, as he was running away, but before he was apprehended, a vehicle with a number of Latin Kings drove past him and that the passengers of this vehicle attempted to shoot at him.

¶ 44 Defendant testified that he did give a statement to an ASA, but he did not say that he wanted to "shoot or hurt the Latin Kings in front of the nightclub." Defendant testified that "[he] the gun from a longer distance because [he] knew it was a close range weapon, and [he] didn't really want to hurt nobody." Defendant did not realize that a police officer had been shot until defendant arrived at the police station. Defense counsel handed defendant a diagram of Mannheim Road. Defendant identified the location from which he had fired his shotgun at the Latin Kings and testified that, according to the diagram, this placed defendant 73 feet and 8 inches from the Latin Kings. This exhibit was later admitted into evidence without objection.

19

¶ 45    On cross-examination, defendant testified that he could not identify a specific distance from where the sawed-off shotgun could be shot at a target without being deadly. The State and defendant then engaged in the following exchange:

"THE STATE: Okay. But you know enough about this gun to know that it's a short range gun, is that correct?

DEFENDANT: Yes.

THE STATE: How short is short range?

DEFENDANT: Um, I know it's not for distance shooting.

THE STATE: When you say distance, how far are we talking?

DEFENDANT: I can't give you an exact—

THE STATE: Then how would you know where you were standing was a safe location to fire this gun?

DEFENDANT: I can't give you that answer.

THE STATE: So you didn't know, did you?

DEFENDANT: I know it's—I know it's not for 73 feet.

THE STATE: Where did you learn that?

DEFENDANT: I am not stupid.

THE STATE: Where did you learn it?

DEFENDANT: I never been in [*sic*] gun school, you know. I am sorry.

THE STATE: So where did you learn that 73 feet is a safe distance to fire this?

DEFENDANT: I never learned it.

THE STATE: You are guessing, aren't you? You just picked that number out of the air, didn't you?

DEFENDANT: No.

THE STATE: Well, then where did you learn it?

DEFENDANT: Where did I learn it? I was told by Mastrianni.[6]

***

THE STATE: And when Mr. Mastrianni told you that, you had been charged with this crime already, hadn't you?

DEFENDANT: Yes.

***

THE STATE: The night you fired that gun, May 8th of 2010, did you know 73 feet was a safe distance?

DEFENDANT: No, I did not.

THE STATE: And so when does this gun become dangerous?

DEFENDANT: It's a weapon. All guns are dangerous."

¶ 46    Defendant further testified that, when he fired his shotgun at the men that attacked him, there were seven or eight of his attackers standing at the corner of the strip mall. Defendant could not observe the faces of these men from where he was standing in the highway, but he knew that these were the men who attacked him because they were "standing in the same spot."

---

[6] "Mastrianni" is the gunshop owner whose testimony was barred at trial.

¶ 47                                    K. State's Rebuttal

¶ 48          The defense then rested, and the State called police detective Christopher Pavini in rebuttal. Detective Pavini testified that on May 8, 2010, at 7:20 a.m., he interviewed Guadalupe Vasquez. During this interview, Vazquez stated that she had no knowledge of defendant owning a firearm. The State then rested in rebuttal.

¶ 49                                 III. Conviction and Sentencing

¶ 50          On February 22, 2013, the jury returned a verdict of guilty against defendant for five counts of attempted first degree murder, one count of aggravated battery with a firearm, and one count of aggravated discharge of a firearm.

¶ 51          On April 2, 2013, defendant argued his posttrial motion for a new trial, which was denied. In aggravation, the trial court heard defendant's criminal history for battery and domestic battery, and that defendant was on probation for battery and aggravated driving under the influence at the time of the incident. The court found that the sentencing range of 20 to 80 years was sufficient to protect the public, so there was no need for an extended sentence or for consecutive sentences. The court then sentenced defendant for 60 years with IDOC, followed by 3 years of mandatory supervised release. Defense counsel then made a motion to reconsider the sentence, which was denied. The court then engaged in the following exchange with defendant:

          "DEFENDANT: And I had a question. You sentenced me to 60 years. Was that like for everything or was it—

          THE COURT: No, some of those sentences were for 30 years, but they all merge. They telescope in.

          The attempt murder to police officer, those sentences are 60 years.

                                            22

DEFENDANT: Yes.

THE COURT: Then you have agg bat [*sic*] to a police officer with a firearm, and that's a 30-year sentence.

And aggravated discharge to a police officer is also a 30-year sentence, but none of these are additional."

¶ 52     Defendant filed a timely appeal.

¶ 53                                ANALYSIS

¶ 54     On appeal, defendant claims: (1) that the trial court erred by barring the testimony of expert witness Donald Mastrianni; (2) that defendant received ineffective assistance of counsel when defense counsel failed to lay a proper foundation to introduce into evidence a supplementary investigation report by Detective Pavini, which defendant claims would have impeached Officer Vicari and Officer Carr; (3) that the mittimus should be corrected to reflect only two counts of attempted first degree murder; and (4) that the mittimus should also be corrected to reflect that the counts of aggravated battery with a firearm and aggravated discharge of a firearm were merged into the two counts of attempted first degree murder. The State agrees with the corrections to the mittimus.

¶ 55     For the following reasons, we do not find persuasive defendant's claims: (1) that the trial court erred in barring the testimony of Donald Mastrianni; and (2) that the failure to lay a proper foundation for the previous statements by Carr and Vicari to Detective Pavini was ineffective assistance of counsel. We do, however, correct the mittimus to reflect only two counts of attempted first degree murder and that the counts of aggravated battery with a firearm and aggravated discharge of a firearm are merged into the two counts of attempted murder.

¶ 56                                I. Elements of Offense

¶ 57        Defendant's claims all concern his assertion that he did not have the requisite intent to commit attempted murder.

¶ 58        "To prove a defendant guilty of attempted murder, the State must prove: (1) that defendant performed an act that constituted a substantial step toward committing a murder; and (2) that he had the criminal intent to kill the victim." *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22 (citing *People v. Green*, 339 Ill. App. 3d 443, 451 (2003)); 720 ILCS 5/8-4 (West 2010); 720 ILCS 5/9-1(a) (West 2008). In the case at bar, defendant denied only the second element, that he did not have the intent to kill Officers Vicari and Carr.

¶ 59        "The question of [a] defendant's state of mind at the time of the crime [is] a question of fact to be determined by the jury ***." *People v. Pertz*, 242 Ill. App. 3d 864, 903 (1993) (citing *People v. Elder*, 219 Ill. App. 3d 223, 225 (1991)). "Mental states, such as the intent to kill or to cause great bodily harm, are not commonly established by direct evidence and may be inferred from the character of the defendant's conduct and the circumstances surrounding the commission of the offense." *People v. Adams*, 308 Ill. App. 3d 995, 1006 (1999) (citing *People v. Summers*, 202 Ill. App. 3d 1, 10 (1990)). These surrounding circumstances may include the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries. *People v. Green*, 339 Ill. App. 3d 443, 451 (2003); see also *People v. Williams*, 165 Ill. 2d 51, 64 (1995). Further, an intent to kill " 'may be inferred if one wilfully does an act, the direct and natural tendency of which is to destroy another's life.' " *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 88 (quoting *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988)).

24

¶ 60    "Under the doctrine of transferred intent, if a defendant shoots at one person, with the intent to kill, but kills an unintended victim, he may be convicted of the crime of murder for the death of the unintended victim." *People v. Thompson*, 313 Ill. App. 3d 510, 516 (2000). "Moreover, the doctrine of transferred intent is applicable in attempt[ed] murder cases." *People v. Hill*, 276 Ill. App. 3d 683, 688 (1995) (citing *People v. Burrage*, 269 Ill. App. 3d 67, 76 (1994)).

¶ 61                              II. Expert Testimony

¶ 62    Defendant claims that the trial court erred by barring the testimony of expert witness Donald Mastrianni, because his testimony would have helped establish that defendant did not have the requisite intent to commit attempted first degree murder.

¶ 63    The decision of whether to admit expert testimony is within the sound discretion of the trial court, and the trial court's ruling will not be reversed absent an abuse of that discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010); *People v. Reid*, 179 Ill. 2d 297, 313 (1997). "Such an abuse of discretion will be found only where the trial court's decision is ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man would take the view adopted by the trial court." ' " *People v. Illgen*, 145 Ill. 2d 353, 364 (1991) (quoting *People v. M.D.*, 101 Ill. 2d 73, 90 (1984), quoting *Peek v. United States*, 321 F.2d 934, 942 (9th Cir. 1963)).

¶ 64    "When considering the reliability of expert testimony, the court should balance its probative value against its unfairly prejudicial effect." *People v. Allen*, 376 Ill. App. 3d 511, 522 (2007) (citing *People v. Enis*, 139 Ill. 2d 264, 290 (1990)). " 'In the exercise of his discretion, the trial judge should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before him prior to admitting it for the jury's

consideration.' " *Allen*, 376 Ill. App. 3d at 522 (quoting *Enis*, 139 Ill. 2d at 290). "[E]xpert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain." *People v. Gilliam*, 172 Ill. 2d 484, 513 (1996).

¶ 65    If a trial court excluded expert testimony in error, it does not commit reversible error if the exclusion is harmless. See *People v. Sutton*, 349 Ill. App. 3d 608, 618 (2004). "An erroneous evidentiary ruling constitutes harmless error if the State can establish beyond a reasonable doubt that the error did not contribute to the jury's verdict." *People v. Denson*, 2013 IL App (2d) 110652, ¶ 24 (citing *People v. Patterson*, 217 Ill. 2d 407, 428 (2005)). "In deciding whether [an] error is harmless, a reviewing court may  '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *Denson*, 2013 IL App (2d) 110652, ¶ 24  (quoting *People v. Becker*, 239 Ill. 2d 215, 240 (2010)).

¶ 66    We first note that, at trial, defense counsel stated "[w]hat our expert would testify to is that [the sawed-off shotgun is] old and the distance from which it was fired, it is not deadly." The trial court held that, as a matter of law, a gun is a *per se* deadly weapon, citing *People v. Merritt*, 367 Ill. 521 (1937). As such, defense counsel was not allowed to introduce testimony that the shotgun was not deadly from the distance at which it was fired. It appears as though, at trial, defense counsel was arguing that defendant did not take a substantial step toward committing murder, because the shotgun was not close enough to actually cause death. *Teague*, 2013 IL App (1st) 110349, ¶ 22 (first element of attempted murder). However, we have consistently held that guns are *per se* deadly weapons. *People v. Blanks*,

361 Ill. App. 3d 400, 411 (2005). Thus, Mastrianni's testimony that the shotgun in this case was not dangerous was not relevant to proving the first element of attempted murder, namely, a substantial step. *Allen*, 376 Ill. App. 3d at 522; *Teague*, 2013 IL App (1st) 110349, ¶ 22. Further, because Officer Vicari was shot in the face with pellets and could have been killed if the pellets struck him in a dangerous area, expert testimony is not needed to prove that which is obvious. See *People v. Mertz*, 218 Ill. 2d 1, 75-76 (2005).

¶ 67       On appeal, defense counsel argues that the trial court erred in barring Mastrianni's testimony because his testimony would have helped establish that defendant lacked the second element, namely, the requisite intent to commit murder. However, Mastrianni's testimony was also not relevant to whether defendant intended to commit murder, because Mastrianni could not testify as to what defendant knew about the shotgun's capabilities. Defendant admitted at trial that, at the moment he fired the shotgun, he did not know that 73 feet was a safe distance, and he learned this fact only after the offense from Mastrianni. Mastrianni's testimony about what defendant learned only later was not relevant to defendant's intent at the time of the shooting. *People v. Thingvold*, 145 Ill. 2d 441, 455 (1991) (holding that testimony from a witness who could testify only to the defendant's intent at a different time than when the offense occurred was not relevant).

¶ 68       For the foregoing reasons, we cannot find that the trial court abused its discretion when it barred the testimony of Donald Mastrianni. *Becker*, 239 Ill. 2d at 234.

¶ 69                                III. Ineffective Assistance of Counsel

¶ 70       Defendant claims that he received ineffective assistance of counsel based on his trial counsel's failure to impeach Officers Vicari and Carr with their prior statements to Detective Panini.

¶ 71  The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness; and (2) absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94).

¶ 72  Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). In considering whether counsel's performance was deficient, a court must indulge a strong presumption that the challenged action, or inaction, was the result of sound trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000); *People v. Evans*, 186 Ill. 2d 83, 93 (1999). "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro,* 175 Ill. 2d 294, 326 (1997). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotation marks omitted.) *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance

28

rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220; *Colon*, 225 Ill. 2d at 135. In other words, the defendant was prejudiced by his attorney's performance. *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011).

¶ 73    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *Evans*, 209 Ill. 2d at 220. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003). We do not need to consider the first prong of the *Strickland* test when the second prong cannot be satisfied. *Graham*, 206 Ill. 2d at 476.

¶ 74    In the case at bar, we need not determine if defense counsel was ineffective in failing to impeach Officers Vicari and Carr with their previous statements to Detective Pavini. *Graham*, 206 Ill. 2d at 476. The overwhelming evidence of defendant's guilt in this case precludes defendant from being capable of showing that there was a reasonable probability that the outcome of the case would have been different if defense counsel had managed to introduce Officers Vicari's and Carr's previous statements into evidence. See *People v. Clay*, 379 Ill. App. 3d 470, 480 (2008); *People v. Williams*, 368 Ill. App. 3d 616, 622 (2006).

¶ 75    Defendant testified at trial that he stood in the middle of a street and deliberately fired a shotgun toward several people. There is no dispute that he hit one person, causing lasting and permanent damage. There are no claims of accident or self-defense. Because the undisputed evidence of defendant's guilt is overwhelming, we need not determine if defense counsel was ineffective in failing to impeach Officers Vicari and Carr with their previous statements to Detective Pavini. *Graham*, 206 Ill. 2d at 476.

¶ 76      First, defendant claims that Officer Vicari's previous statement to Detective Pavini, that he was told to "check out" a "large crowd" in front of the bar, would have impeached Officer Vicari's testimony that there were no Latin Kings in the bar parking lot and would have supported defendant's claim that there was a large crowd of individuals in the parking lot. However, Officer Vicari's statement to Detective Pavini was very brief. It is not clear from the statement if the "crowd" Officer Vicari was sent to "check out" is referring to the first time Officer Vicari was sent to the bar or the second time. Moreover, the statement explicitly says "in summary & not verbatim or in its entirety," so it is questionable if the statement would have truly impeached Officer Vicari.

¶ 77      However, even if Officer Vicari's previous statement had been raised at trial and the term "crowd" was a discrepancy with his trial testimony, defendant has not raised a reasonable probability that it would have affected the outcome of his case. It further appears that the issue as to whether there were other people in the parking lot may be a collateral matter, and impeachment of a collateral matter cannot be error. See *People v. Sanders*, 2015 IL App (4th) 130881, ¶ 49. Defendant's claim rests on the idea that four police officers perjured themselves by falsely stating that there were no Latin Kings in the bar parking lot. However, even if, for the purpose of reviewing defendant's claim, we were to assume that all four of these officers were impeached, there is still overwhelming evidence for the jury to find defendant's guilt. In defendant's statement to the ASA, defendant stated that he wanted to "shoot or hurt" the Latin Kings. Defendant admitted at trial to shooting at a group of men, although he claimed he was firing to frighten, not kill, the gang members who had beaten him. However, " '[t]he very fact of firing a gun at a person support[s] the conclusion that the person doing so acted with an intent to kill.' " *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110

30

(2001) (quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978)). " '[T]he intent to murder can be inferred from the act of firing a gun at a person because the natural tendency of such an act is to destroy another's life.' " *People v. Garcia*, 407 Ill. App. 3d 195, 201 (2011) (quoting *People v. Smith*, 258 Ill. App. 3d 1003, 1027 (1994)). Thus, there was ample evidence for the jury to conclude that defendant had an intent to commit murder. The fact that defendant intended to murder the Latin Kings is not relevant, because defendant's intent is transferred to the officers, at whom defendant fired. *People v. Hill*, 276 Ill. App. 3d 683, 688 (1995). As a result, defendant has not demonstrated a reasonable probability that, if defense counsel had laid a proper foundation for the introduction of Officer Vicari's previous statement, the result of the proceeding would have been different, as *Strickland* requires. *Colon*, 225 Ill. 2d at 135 (citing *Strickland*, 466 U.S. at 699).

¶ 78         Defendant also claims that defense counsel was ineffective for failing to use Officer Carr's previous statement to Detective Pavini, that defendant was firing from the second lane of Mannheim Road, to impeach Officer Carr, who testified at trial that defendant was firing from the median of Mannheim Road. "[W]hen assessing the importance of the failure to impeach for purposes of a *Strickland* claim, '[t]he value of the potentially impeaching material must be placed in perspective.' " *People v. Brown*, 371 Ill. App. 3d 972, 978 (2007) (quoting *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989)). Defendant testified at trial that he was 73 feet and 8 inches away when he started firing and that he did not know whether this was a safe distance from which to fire his shotgun at a target. Therefore, whether defendant was a few feet closer, as the officer testified, or 73 feet and 8 inches, as defendant testified, was not relevant to defendant's intent since, by his own admission, he did not know whether the further distance was safe. As a result, defendant has not demonstrated a reasonable

31

probability that, if defense counsel had laid a proper foundation for the introduction of Officer Carr's previous statement, the result of the proceeding would have been different, as *Strickland* requires. *Colon*, 225 Ill. 2d at 135 (citing *Strickland*, 466 U.S. at 699).

¶ 79                    IV. Correcting the Mittimus

¶ 80        Defendant claims that the trial court erred by listing on the mittimus: (A) all five counts of attempted first degree murder; and (B) the counts for aggravated battery with a firearm and aggravated discharge of a weapon. Defendant claims that the mittimus should be corrected to reflect only two counts of attempted first degree murder. The State agrees that the mittimus should be corrected to reflect only two counts of attempted first degree murder. For the following reasons, we correct the mittimus accordingly.

¶ 81                    A. One-Act, One-Crime Rule

¶ 82        First, defendant claims that under the one-act, one-crime rule articulated in *People v. King*, 66 Ill. 2d 551, 566 (1977), the trial court erred in listing all five counts of attempted first degree murder on the mittimus.

¶ 83        Whether defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010); *People v. Artis*, 232 Ill. 2d 156, 161 (2009); *People v. Kolton*, 219 Ill. 2d 353, 361 (2006). *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)). While defendant did not file a motion to reconsider his sentences before the trial court, our supreme court has held that any forfeited one-act, one-crime arguments may be evaluated by a reviewing court under the second prong of the plain error rule because they implicate the integrity of the judicial

process. *Nunez*, 236 Ill. 2d at 493 (citing *Artis*, 232 Ill. 2d at 167-68). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Our supreme court permits review of forfeited one-act, one-crime claims under the second prong. *Nunez*, 236 Ill. 2d at 493 (citing *Artis*, 232 Ill. 2d at 167-68).

¶ 84    In the case at bar, defendant was found guilty of three counts of attempted first degree murder for the single act of shooting at Officer Vicari. Defendant was also found guilty of two counts of first degree murder for the single act of shooting at Officer Carr. According to the one-act, one-crime rule, defendant should have been sentenced for only one count of attempted first degree murder stemming from each act. *King,* 66 Ill. 2d at 566. Both parties ask us to make this correction. Thus, we correct the mittimus to reflect only two counts of attempted first degree murder, not five counts. *People v. Mitchell*, 234 Ill. App. 3d 912, 921 (1992) ("[T]his court may court may correct the mittimus without remanding to the trial court").

¶ 85                                B. Merging the Lesser Counts

¶ 86    Defendant's next claim is that the trial court erred by not merging the counts of aggravated battery with a firearm and aggravated discharge of a weapon into the two counts of attempted first degree murder, as the trial court verbally stated it would do. The question

of whether defendant's mittimus should be corrected is a purely legal issue, subject to *de novo* review. *People v. Lewis*, 2012 IL App (1st) 102089, ¶ 23 (citing *People v. Jones*, 397 Ill. App. 3d 651, 656 (2009)). While defendant did not file a motion to reconsider his sentence, a corrected mittimus may be issued at any time. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 35 (citing *People v. Quintana*, 332 Ill. App. 3d 96, 110 (2002)).

¶ 87    "Although a written order of the circuit court is evidence of the judgment of the circuit court, the trial judge's oral pronouncement is the judgment of the court." *People v. Whalum*, 2012 IL App (1st) 110959, ¶ 41 (citing *People v. Smith*, 242 Ill. App. 3d 399, 402 (1993)); *People v. Lewis,* 379 Ill. App. 3d 829, 837 (2008) (also citing *Smith*). " 'When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement controls.' " *Whalum*, 2012 IL App (1st) 110959, ¶ 41 (quoting *Smith*, 242 Ill. App. 3 at 402); *Lewis,* 379 Ill. App. 3d at 837; *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007) (citing *Smith*); see also *People v. Diaz*, 377 Ill. App. 3d 339, 351 (2007).

¶ 88    In the case at bar, the trial court stated that it would merge the counts of aggravated battery with a firearm and aggravated discharge of a firearm into the counts of attempted first degree murder. However, the mittimus contains both of the lesser counts. Both parties ask us to correct the mittimus to merge the lesser counts. Accordingly, we correct the mittimus and merge the counts of aggravated battery with a firearm and aggravated discharge of a firearm into the counts of attempted first degree murder. *Mitchell*, 234 Ill. App. 3d at 921.

¶ 89    For the foregoing reasons, we correct the mittimus to reflect only two counts of attempted first degree murder.

¶ 90                                    CONCLUSION

¶ 91         In sum, we do not find persuasive defendant's claims: (1) that the trial court erred in barring the testimony of Donald Mastrianni, and; (2) that defendant received ineffective assistance of counsel. We do, however, correct the mittimus to reflect only two counts of attempted first degree murder.

¶ 92         Affirmed; mittimus corrected.