2023 IL App (1st) 200304

SIXTH DIVISION
September 29, 2023

No. 1-20-0304

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 13944 |
| JERRELL DORSEY, | ) ) | The Honorable Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Justice Tailor specially concurred, with opinion.

**OPINION**

¶ 1        Defendant, Jerrell Dorsey, was convicted after a jury trial of first degree murder, aggravated battery with a firearm, and aggravated discharge of a firearm in connection with the death of seven-year-old Heaven Sutton (Heaven) and the injury of Marquice Monroe (Marquice) on June 27, 2012, in Chicago. The charges stemmed from a shooting on North Luna Street that occurred immediately after two men emerged from a gangway onto the street. Defendant stated in a videotaped interview that he emerged from the gangway with Lance

Sims, who he identified as the shooter,[1] and that he was "watching [Sims's] back." Defendant acknowledged that Sims had been previously shot by rival gang members.

¶ 2 Defendant received a total sentence of 60 years that included 50 years for the murder of Heaven and 10 years for the aggravated battery of Monroe. In addition, defendant received a concurrent four-year term for aggravated discharge of a firearm.

¶ 3 On this appeal, defendant claims (1) that his warrantless arrest, based on an investigative alert, violated the warrant clauses of both the United States and Illinois Constitutions (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6), and that, although his trial counsel filed a suppression motion, counsel was ineffective for failing to include this particular ground in the motion; (2) that the trial court erred by denying the suppression motion that counsel did file, where defendant had asserted his right to counsel while in police custody, but the trial court found that defendant reinitiated a conversation with the police and waived his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)); (3) that the trial court abused its discretion by admitting the portion of defendant's confession stating his gang affiliation and by admitting testimony confirming that affiliation and the fact that the location of the shooting was in the territory of a rival gang, where the gang evidence was more prejudicial than probative; and (4) that the evidence against defendant was so unsatisfactory as to justify a reasonable doubt of his guilt, where the eyewitnesses denied or recanted their prior identifications of him, where witnesses alleged police misconduct, where defendant was denied his right to counsel, where no forensic evidence linked him to the scene or to the crime, and where there was no identifiable motive for the crime.

---

[1]However, the State's forensic expert testified that the fired shell casings, which were recovered from the scene, came from two separate guns.

¶ 4        In the above claims, defendant seeks to suppress his postarrest interview on two separate grounds: one raised by his trial counsel before trial and one that was not. Although defendant challenges his arrest due to the investigative alert, he does not dispute the underlying probable cause for the alert.

¶ 5        For the following reasons, we reverse and remand for a new trial.

¶ 6                                    BACKGROUND

¶ 7                            I. Pretrial Suppression Hearing

¶ 8        At the suppression hearing, Detective Gregory Swiderek testified that defendant was arrested at approximately 11 p.m. on June 29, 2012, and transported back to Area North of the Chicago Police Department. The postarrest interviews of defendant were videotaped and played during the hearing. At 11:28 p.m. on June 29, Detective Swiderek read defendant his *Miranda* rights, defendant immediately invoked his right to counsel, and questioning ceased.

¶ 9        On the following day, which was June 30, at 6:30 a.m., Detectives Swiderek and Marco Garcia brought defendant down to the lockup where detainees are allowed to make phone calls. Detective Swiderek testified that, "[t]ypically *** the lockup keeper will ask, do you want to make a phone call, and they'll make a phone call." An hour later, Detectives Swiderek and Garcia brought defendant back up. Detective Swiderek did not ask defendant if he had spoken with his attorney.

¶ 10        At 4 p.m. on June 30, defendant appeared in a lineup viewed by Ashake Banks, Malik Ellis, and Ieshia Richardson, who were at the scene. None of them identified defendant as a shooter. At 5:16 p.m., defendant asked Detective John Hillman whether his attorney had arrived but did not specify the attorney's name. At 7:20 p.m., defendant knocked on the door of the interview room where he was being held, and Detective Michele Wood responded.

¶ 11    After defendant knocked, Detective Wood entered the interview room and had a short conversation with defendant, which is the basis of one of the claims on appeal. The video established that, after defendant knocked, Detective Wood and defendant had the following exchange:

"WOOD: Go over there. Take your hands out of your pants. What's up?

DEFENDANT: So I got picked in the lineup?

WOOD: You said you don't want to talk to us, so I can't talk to you unless I read you your rights and you want to talk to me.

DEFENDANT: What you mean 'read me my rights?'

WOOD: You have the right to remain silent; anything you say can and will be used against you; you have a right to an attorney; if you can't afford an attorney, one will be provided for you. [Sigh.] I'm so tired, I can't even think right now.

Do you want to talk to me? I'll read you your rights. I'll get it from a book and I'll talk to you; but if not, I can't talk to you because you said you don't want to talk to me.

DEFENDANT: Do I get a phone call?

WOOD: You'll get a phone call.

DEFENDANT: When?

WOOD: Soon as we're done.

DEFENDANT: Done with what?

WOOD: Who—who do you want to call?

DEFENDANT: I want to call my lawyer.

WOOD: Ok, wait. Hold on one second. Do you want to talk to me? Do you want me to come back?

DEFENDANT: Yeah.

WOOD: Ok, give me two seconds. [Wood exits.]"

Detective Wood exited, returned, read *Miranda* warnings, and continued talking with defendant. Notably, defendant told Detective Wood that he was at a club near Lincoln Park when the shooting occurred. At 9:17 p.m., defendant appeared in a lineup viewed by Marquice, who did not identify defendant as a shooter.

¶ 12    At 9:34 p.m., Detectives Swiderek and Garcia entered the interview room and interviewed defendant until 10:20 p.m. Shortly after entering, the detectives told defendant that he had been identified, and one said "How many lineups have you been in today? Been in a few, right?" At the suppression hearing, the officers testified that they informed defendant that he had been identified because he had been identified from photo spreads by witnesses Antwan Monroe (Antwan) and Wesley Davis. Davis had identified defendant as one of the shooters, and Antwan said that he observed defendant running from the scene with a gun. Both stated that they had known defendant for a number of years.

¶ 13    At 10:01 p.m., as indicated by the time on the videotape, defendant stated: "I was with the shooter." Defendant said, "I thought we were just going through there," referring to the gangway. Defendant stated: "I guess [Sims] end up seeing somebody, so he let off."

¶ 14    At 10:25 p.m., defendant appeared in a lineup viewed by Antwan, who identified defendant as the man who Antwan had observed running from the scene with a handgun after the shooting. Immediately after the lineup, Detective Swiderek and defendant reentered the interview room and defendant asked, "What? I just got pointed out again?" Detective Swiderek

replied, "Yup." Defendant asked: "People have pointed me out?" Detective Swiderek replied: "How many have we had? I don't even know."

¶ 15    At 10:27 p.m., with both detectives in the room, defendant stated that, when he and Sims were going through the gangway, defendant was "watching his back," which defendant explained meant that he was looking out for police or rival gang members as Sims proceeded in front of him. The police asked when it was that Sims asked defendant to watch his back, and defendant replied that it was simply "a known fact" because defendant was "with him." Defendant explained that it was just as if one of the two detectives was going through a gangway; whoever went first, the other one would watch his back. Defendant asked each of the detectives, in turn: "If you up front he gonna watch your back, right, [and] you gonna watch his back, right?" Defendant continued, saying "and if it's vice versa, if, you know what I'm saying, he was in front of you, you'll be watching his back, right?" Prior to going through the gangway, defendant was on Linder Avenue, and Sims "told [defendant] to slide through the cut with him," using the word "cut" to refer to the gangway.

¶ 16    Defendant did not know "at first" that Sims had a gun. The first time defendant saw the gun was when they had already gone through the gangway and Sims pulled it out. Defendant stated: "When I got through the cut, and he was in front of me, and I seen it, what else could I do?" Defendant did not see where Sims pulled the gun out from because it was dark. When the police asked, "how many of you were there out there," defendant replied that there were "two of us in front and one in the back." The one in the back was "[j]ust in the alley."

¶ 17    Defendant stated that, after they had gone through the gangway, Sims "was like there they go and sh*** start letting off." When asked "what do you think he means by there they go," defendant replied, "that's the Mafia." Defendant assumed that Sims had "seen 'em,"

6

meaning Mafias, who were rival gang members.[2] Defendant said "yeah," when the police asked if Sims had been "recently" shot by "some Mafias." When the police asked whether that was before or after defendant was shot, defendant said it was after.

¶ 18        Defendant stated that Sims first started shooting "on the side" and "in the street," and then Sims went toward the sidewalk on the other side of the street, which would have been closer to Central Avenue. Sims was shooting toward Wabansia Avenue. Defendant did not see a tent out there or people because it was "too dark." After Sims started shooting, defendant took off running. Defendant stated that he ran back through the gangway, toward Linder Avenue. But one of the detectives responded: "The dude that just picked you out saw you run to Bloomingdale and then down Bloomingdale. So, you gonna keep this real, keep it real." Defendant insisted "I just ran," but the detective said, "come on, man, you know where you ran." So, defendant said, "okay, I ran down Bloomingdale." Defendant said he ran down Bloomingdale Avenue to Linder Avenue. The detective asked if Sims passed defendant the gun and then stated "[t]he guy that seen you running says you're carrying the gun." The detective said: "Hey, if you took the gun that doesn't mean you shot, but you gotta keep it real." The detective stated:

> "there was a difference between shooting the little girl, alright, and watching his back, and taking the gun, and running with the gun. That's a big difference, okay? That's a big difference. That's like what we're talking about intent. That's a big difference. There's a big difference there. So, we're trying to keep it real with you, we want you to keep it real with us."

---

[2]Although it was dark, defendant "guess[ed] he seen the white t-shirt." However, defendant did not explain the significance of a white shirt.

¶ 19     The detective continued, saying that the witness knew defendant and knew that defendant ran down Bloomingdale Avenue. Defendant replied: "I – I ran down Bloomingdale." The detective followed up with, "you ran down Bloomingdale and he passed you the gun. Is that true or not?" Defendant silently nodded. The detective said: "Just end this man, just end this, you're not saying you shot." Defendant said: "I can't go down for that little girl." The detective replied: "I'm not talking about going down for that little girl." The detective continued: "I told you the guy that picked you out says he sees you running, alright, with a black-colored gun. Okay?" Defendant insisted that he did not shoot the little girl. The detective said Sims "passed you the gun and you got the f*** out of there. Am I right or wrong?" Defendant said "yeah." The detective repeated: "He passed you the gun and said get the f*** out of here?" and defendant said "no." The detective argued with defendant, saying: "You just said yeah." The detectives reminded defendant that the man who picked him out of the lineup saw him running with a gun. Defendant replied: "That man had to see my [inaudible] or something." One of the detectives said: "What? No. He saw you running with the gun." The other detective asked: "Did he pass you the gun? You said yes a minute ago." Defendant then said, "[y]eah."

¶ 20     When asked what he did with the gun, defendant said: "I gave it back to him." When asked where they were when defendant returned the gun, defendant said that they were "in the alley, the Linder alley," but that he did not know where the gun was now. Defendant said it was "a revolver," and he agreed with the detective when the detective said it was an automatic. The detective stated that "he passed you the automatic after he shot and you ran around the corner, right?" Defendant said: "Uh-huh." The detective continued: "With the gun, right? And you ran down Bloomingdale, and you gave it back to him, is that correct?" Defendant said:

"Yeah." The detective said, "Is that the truth?" Defendant replied, "That's the truth. I—I can't go down for shooting the little girl."

¶ 21 Seconds later, the two detectives exited the interview room at 10:45 p.m. Detective Swiderek testified that, at that time, he spoke with Sergeant Sarone, who informed Detective Swiderek that there was an attorney downstairs for defendant. Sergeant Sarone provided Detective Swiderek with a copy of an "Attorney Visitation Notification" form with attorney Eric Dunham's name on it. Detective Swiderek testified that, at 10:50 p.m., he informed defendant that an attorney was there to see him, and defendant signed the form, indicating that he wanted to see him. Dunham was escorted into the interview room where defendant was, and the recording equipment was blocked off. Dunham met with defendant for a half-hour before leaving.

¶ 22 Just before midnight on June 30, 2012, defendant appeared in a lineup viewed by Davis, who identified defendant as the person Davis observed shooting at him and at the group of people Davis was standing with.

¶ 23 Defendant's parents, Vernell Dorsey Sr. (Vernell) and Jerri Dorsey (Jerri),[3] testified about the events leading them to hire attorney Dunham to represent their son. Defendant's father, Vernell, testified that he was 61 years old, that he had been married for 36 years, that he and his wife lived in the same single-family home which they had owned for 32 years, and that he had worked for the United States Postal Service for 39 years. On June 28, 2012, he was working a 7 a.m. to 3 p.m. shift at a location six blocks from his home. After receiving a call from his wife stating that their house was surrounded by law enforcement, he went home in

---

[3]Since defendant and his parents share the same last name, we will refer to the parents by their first names. Since defendant's father and defendant's brother share the same first name, we will refer to his father as Vernell and defendant's brother as Vernell Jr.

the middle of his shift and observed that his home was, indeed, "surrounded by law enforcement," who were in both plain clothes and in uniform. At the house were (1) his 34-year-old disabled son, Vernell Dorsey Jr. (Vernell Jr.); (2) his 18-year old granddaughter; and (3) Tameka Hobson, who is his granddaughter's mother. His wife was not at home.

¶ 24     Vernell testified that he was about 10 steps from his front gate when a plainclothes officer approached him, asked if Vernell lived in the home, and stated that they were looking for defendant. After Vernell entered, he observed four to six people searching his home. Vernell stayed there for about a half hour and then returned to work to complete his shift. Later, two plainclothes officers came to Vernell's workplace, stayed 5 or 10 minutes, and left him with a business card. After completing his shift and overtime, he returned home at 5 or 5:30 p.m., to find that the police had left. In addition to the people who had been there earlier (namely, his son Vernell Jr., his granddaughter, and her mother), his wife and attorney Dunham were now also at the house. After they spoke with Dunham for about an hour, his wife hired him. During this time, Dunham looked at a police business card that had been left at the house. Also, during this time, defendant called the house landline and spoke to his mother, and she handed the phone to the attorney. Vernell overheard Dunham saying to defendant that he wanted defendant to turn himself in. That was the only time that Vernell spoke with Dunham.

¶ 25     Vernell testified that, on June 29, 2012, he received another call at work alerting him to the fact that the police were back at his house, and he went home to find four or five officers, some who were in uniform and some in plain clothes. This group of officers was different from the officers who had been there the day before. A sergeant said that "he was in charge of the task force and they were looking for" defendant. The following day, which was Saturday, June 30, Vernell learned, while watching the television news, that defendant had been arrested.

Earlier that day, on Saturday morning, Vernell had called defendant because that was when defendant was supposed to turn himself in, but there had been no answer.

¶ 26     On cross, Vernell testified that on June 27, 2012, when he arrived home from work at about 5:30 p.m., defendant was there. Vernell fell asleep shortly after arriving home and did not know when defendant left. On June 28, after Vernell arrived home from work, his wife was speaking with Dunham in the dining room, and he joined them. At some point, Dunham said he would take the case, but Vernell did not know if Dunham and his wife had discussed money. While Dunham was there, defendant called the house landline, which is located in the dining room. Later, Vernell's wife told him that she had tried to contact Dunham, but Vernell did not overhear her talking with Dunham on the phone.

¶ 27     Vernell's wife, Jerri, testified that she had worked for 25 years doing data entry work for Bank Tech. While at work on June 28, 2012, she received several calls from her home landline that were immediately disconnected. The first couple of times she tried to call back, but no one picked up. The third time, the phone was picked up, and she heard a lot of noise in the background before she was disconnected. Then she called Vernell Jr. on his phone,[4] and he said there were a lot of police officers at their house. Jerri said she would call his dad and tell him to go home immediately, which she did. Jerri left work, arriving home around noon to find three uniformed police officers still inside the house. The officers were speaking with Jerri's granddaughter and defendant's girlfriend, Tameka. Jerri noticed a business card left on the table which said "Sergeant," but she did not recall the name. The officers stayed for another half hour and left.

---

[4]On cross, she explained that Vernell Jr. had a separate landline.

¶ 28    Jerri testified that, on June 28, she contacted her sister who provided attorney Dunham's name and phone number. Jerri called him at 2 or 3 in the afternoon, and Dunham arrived at their house around 4 or 4:30 p.m. After hiring him to represent her son, Jerri wrote out a check from her own personal checking account, which she handed to him. Defendant called the house landline, which Jerri answered in the living room[5] and handed to Dunham, who spoke with defendant for 10 or 15 minutes. Jerri walked away while they were speaking and spoke to Dunham afterward. Dunham told her that defendant, accompanied by Dunham, was going to turn himself in, hopefully on Friday, June 29, but Jerri did not know if it was actually scheduled for then. Jerri became aware that defendant had not surrendered when she learned of his arrest on the news. After she learned of his arrest, she went to the police station at Grand Avenue and Central Avenue and spoke to someone at the front desk who told her that defendant was at the Belmont police station. Jerri called Dunham to tell him where defendant was. Although she was able to reach Dunham immediately, it took "some time" for Dunham to reach the Belmont station because he was on the south side. That was the last contact she had with Dunham until defendant was charged and went to court.

¶ 29    On cross, Jerri testified that when defendant called on June 28, she told him that they had retained an attorney. She learned that her son was in custody from watching the television news at noon or 1 p.m. on Saturday, June 30. After watching the news, she went to the police station at Grand Avenue and Central Avenue, where she learned defendant was at the Belmont station. Jerri and her sister then went to the Belmont station around 2 p.m. but were unable to see defendant. Jerri called Dunham from there, and he told her that she could leave because he

---

[5]Although her husband had testified that the call occurred in the dining room, Jerri explained that the dining room and living room are "real close together."

12

was on his way. On redirect, Jerri testified that, when she arrived at the Belmont station, she was stopped at the door. An officer came out and asked her who she was there to see. When she told him, the officer told her that she could not see her son because he was in custody and "in interrogations." Jerri told the officer that defendant had a lawyer, but the officer said it did not matter.

¶ 30        Dunham testified that he had been a practicing attorney in Illinois for 40 years. On June 28, 2012, after being contacted by defendant's mother, he went to her home. During the visit, which lasted about an hour and a half, he was retained to represent her son. At Dunham's request, defendant's parents signed a standard retainer agreement and provided compensation. Dunham spoke with defendant on the phone and later met with him in person on June 29, 2012, for a couple of hours. The family had shown Dunham a police officer's business card, and Dunham later called the number on the card. Defendant agreed with Dunham that defendant needed to surrender himself, and Dunham spoke to a marshal on the fugitive apprehension unit to arrange it. Unfortunately, prior to testifying at the hearing, Dunham could not locate his notes from this incident, which had occurred a few years ago, so Dunham did not know either the name of the marshal who he spoke with or the exact date, but the call occurred within four hours of speaking with defendant. Dunham told the marshal that he had been retained by the family, that he was representing defendant, that he wanted to be there when defendant was taken into custody, and that defendant wanted to turn himself in. It was agreed that the next day, which would have been June 30, defendant would turn himself in, between noon and 3 p.m. The plan was to meet at a restaurant and then go to the Belmont police station together.

However, on the morning of June 30, Dunham was not able to locate defendant.[6] Shortly before noon, he contacted the marshal who said he did not know where defendant was.

¶ 31    Dunham testified that, after receiving a call at 3:30 or 4 p.m. from the parents saying that defendant's arrest was on the news, Dunham called various police stations, including the Belmont station, to find out where defendant was being held. Officers at the desk at the Belmont station said they had no information. Later in the day, at 5, 6 or 7 p.m., the parents called Dunham to say that defendant was at the Belmont station. Dunham called and spoke with the desk sergeant at the Belmont police station, who said that defendant was in custody and was talking with detectives. Dunham told the sergeant that he was representing defendant and to hold additional questions until Dunham arrived. Dunham eventually spoke to a detective at around 8:30 or 9 p.m. and stated that he would be there shortly and not to speak to defendant until then. The detective, whose name Dunham could not recall, stated that he was talking to defendant, and Dunham told him "to stop any conversation."

¶ 32    After speaking with the detective on the phone, Dunham drove to the station, which took approximately 45 minutes. After entering the Belmont station, Dunham provided the desk sergeant with his attorney registration card, and the sergeant told him to wait. After waiting 20 minutes, Dunham demanded to speak with defendant immediately. Ten minutes later, a couple of detectives came down to speak with Dunham, but he did not recall their names. One of the detectives gave Dunham a form to sign, which the detective said he would take to defendant. After another 10 or 15 minutes, they came back down and took Dunham to a holding cell where he met with defendant. One of the detectives told Dunham that they had been talking to defendant and that defendant "had just made a statement." Dunham was at the station for

___

[6]Defendant had already been arrested.

approximately 45 minutes before he was allowed to see defendant. Defendant's mother was there when Dunham arrived.

¶ 33    On cross, Dunham testified that he met with defendant twice prior to defendant's arrest: once at the home of a friend of defendant's and once at his parents' home. After being retained, Dunham's first in-person meeting with defendant occurred just a couple of hours after Dunham's meeting with the parents, and it occurred in the kitchen of defendant's parents' home. By the time they finished, it was 11 or 12 at night. At that point, Dunham told defendant that he had called the officer whose card was left at the parents' home and had made arrangements for defendant to turn himself in the next day. Dunham had spoken to the officer at around 8 p.m. However, Dunham did not recall whether these events transpired on June 28 or June 29.

¶ 34    Dunham testified that the officer from the fugitive team wanted to meet Dunham in a fast food restaurant down the street from the Belmont station between noon and 3 p.m. on June 30. Prior to the meeting, Dunham was supposed to pick up defendant. After meeting the officer at the restaurant, the plan was to head to the police station. Dunham was supposed to meet defendant at noon on June 30; however, Dunham started trying to reach defendant at 10 a.m. and could not reach him. Dunham called the officer shortly before noon, stating that he could not reach defendant and asking if the officer knew where defendant was. The officer said he did not. Dunham said that he understood that defendant may have been arrested, and the officer replied that "he had no knowledge of that whatsoever."

¶ 35    The State marked certain photocopies as a group exhibit, labeled People's exhibit No. 1. Dunham identified a copy of his Attorney Registration and Discipline Commission (ARDC) card, his Cook County Sheriff identification, and an attorney visitation form. Dunham testified

that the copy of his ARDC card and identification was a copy of what he had provided to the police. The assistant state's attorney (ASA) observed that "[t]here is a note on it that says 30 June 12:10:45 p.m.,"[7] and Dunham agreed that there was such a note. As for the visitation form, Dunham testified that the police told him they had to fill it out and present it to defendant. The ASA observed: "The time that's noted on it says 22:45 for arrival and 22:51 for time of visitation." Dunham explained: "That's when [defendant] signed it." When asked whether he was there when defendant signed it, Dunham said no, but that was defendant's signature and "[t]hat's the time that's listed right there."[8]

¶ 36    On redirect, Dunham testified that the officer was going to meet both Dunham and defendant at the fast food restaurant near the Belmont station and that Dunham had definitely arrived at the police station before 10:45 p.m.

¶ 37    Officer Jeremiah Johnson, a Chicago police officer for 12 years, testified that he was assigned to the Area North Fugitive Apprehension Team and was so assigned in 2012. Johnson went at least once to the Dorsey home, but he did not leave a business card and did not meet with anyone at the home while there. Johnson did not speak with Dunham, and no one on his team told him that they had been in contact with an attorney for defendant. Johnson was not aware of an arrangement for defendant to turn himself in. While an arrangement can be made for a defendant to turn himself in, the officers "always tell the attorneys" that they will continue looking for the offender. If an arrangement is made, it is usually for a specific time and it would be "very unusual" for it to occur at a restaurant, due to safety concerns. The "safest place" for a suspect to turn himself in would be the police station.

---

[7]This appears to be a reference to June 30, 2012, at 10:45 p.m.
[8]Detective Swiderek had similarly testified that 10:50 p.m. was the time that defendant signed the form.

¶ 38     On cross, Johnson testified that there were two teams working on this case out of Area North. The Area North team had reached out to "what's called a 700 team to help out." The Area North team consisted of 10 Chicago police officers, 1 Chicago police sergeant, and 1 United States marshal. United States Marshal Jason Norwick was assigned to the Area North team, and United States Marshal Diego was assigned to the other unit. When Johnson went to the Dorsey home on June 28, United States Marshal Johnson had only been on the team for two weeks, and so his role was "to look and listen," but he did not go in. United States Marshal Johnson knew that Sergeant Tom Stack, who was in charge of their team, had a business card, but United States Marshal Johnson did not know whether the marshals did.

¶ 39     At the end of the suppression hearing, the trial court found Dunham's testimony to be "incredible" and "rife with I don't remembers." The court found it "absurd" that a "person who allegedly committed murder" would be surrendered "in a public place with people around." After watching video clips of defendant, the court observed: "I never saw [defendant] name Eric Dunham. I don't even know if he knew who Eric Dunham was at that point because I don't believe Mr. Dunham followed through with anything about his promises to represent him, or [defendant] would have named him."

¶ 40     With respect to the parents' testimony, the judge stated that he believed that defendant's parents met with, hired, and paid Dunham and he felt sorry for them, but that they had "no knowledge of what happened after that."

¶ 41     With respect to defendant's invocation of the right to counsel, the trial court found:

         "THE COURT: I do believe the Defendant first invoked his right [to counsel]. I do believe that he reinitiated conversation by knocking on the door with Detective Wood. He was then given his rights again. He did mention a phone call. The police do not have

17

to hand him a phone, buy him a phone, provide him with a phone. He was given access to a phone from the testimony of two witnesses, Detectives Swiderek and Garcia, when he was taken down to the lockup. It's his opportunity to use a phone. Apparently, he did not.

And I haven't heard any evidence outside of Mr. Dunham's testimony, which I do not believe, of any prearrangements to surrender [defendant]. That belies all bounds of common sense and again, I do not believe that.

But for[9] the foregoing reasons, the Court finds, as a matter of law, that the defendant's 6th Amendment rights were not violated, and that the motion to suppress statements is denied."

¶ 42                                   II. Trial

¶ 43        The State's evidence at trial established that, at approximately 10:45 p.m. on the night of June 27, 2012, a shooting occurred after two men emerged from a gangway onto North Luna Street. Multiple shots were fired, and seven-year-old Heaven was killed, while Marquice was injured. Leslie Richardson, Heaven's mom, sold candy from a tent on North Luna Street. Heaven was under the tent when she was shot, and Ellis, Heaven's older brother, was across the street. Ellis observed the two men, and Ellis later identified Sims as the man whom Ellis observed emerging from the gangway holding a handgun.

¶ 44        Antwan, brother of the injured Marquice, provided a handwritten statement to ASA Aleksandra Gillespie[10] prior to trial stating that he had witnessed defendant running from the

---

[9]The transcript states "[b]ut for," although this seems, from the context, to be a typo.
[10]By the time of trial, Gillespie was a Cook County circuit judge in the Second Municipal District. However, we refer to her here as an ASA because that was her title at the time that the relevant events unfolded.

scene holding a black handgun, and Antwan testified to the same before a grand jury. However, at trial, he recanted.

¶ 45    ASA Gillespie testified that, on June 28, 2012, which was the day after the shooting, Antwan signed a statement in which he stated that, immediately after hearing shots, he had observed defendant, who Antwan had known for five or six years, holding a black gun in his left hand about waist high. Antwan stated that defendant was running, first north on Luna Street and then east onto Bloomingdale Avenue. Antwan further stated that he knew defendant to be a member of the Four Corners Hustlers gang. Antwan later testified to these facts in front of the grand jury, and both his statement and grand jury testimony were read into the record.

¶ 46    At trial, Antwan testified that, at the time of trial, he was 30 years old and playing semi-professional basketball for the American Basketball Association. At trial, Antwan denied hearing any gunshots on the night of the shooting and denied telling police that he had heard gunshots or seen anyone with a gun. He testified, among other things, that police kept him in a windowless interview room for two days.

¶ 47    Davis provided a handwritten statement to ASA Gillespie prior to trial stating that he had observed defendant shooting a gun at the scene, and Davis testified to the same before the grand jury. However, at trial, Davis, who was 35 years old at the time of trial, gave noncommittal answers or failed to recall or denied when asked about various facts in his prior statement or grand jury testimony. He testified, among other things, that the police were "[a]rguing" with him and "[h]ollering" at him and putting their hands on him.

¶ 48    At trial, ASA Gillespie testified that, on June 28, 2012, the day after the shooting, Davis signed a statement in which he stated that he lives about five houses south of the tent near where seven-year-old Heaven was shot. Davis stated that, immediately before the shooting, he

and his friend, Marquice, one of the victims, went to the tent to buy a cigarette. After hearing three or four shots coming from right behind him, Davis turned and saw defendant, who Davis had known for 10 years. Davis stated that defendant was a member of the Four Corner Hustlers gang, while Davis and Marquice were members of a rival gang, the Mafia Insane Vice Lords. Defendant was standing in the middle of the street, with a gun in his hand, and Davis could see the flashes coming from defendant's gun as defendant fired. Defendant fired 10 or 11 shots, while Davis ran south toward a gangway to take cover.

¶ 49        Davis's grand jury testimony was substantially similar to his pretrial statement, except that instead of stating that he and Marquice were members of the Mafia Insane Vice Lords, Davis testified before the grand jury that the tent was located in Mafia Insane Vice Lord territory. Also, before the grand jury, Davis testified that defendant was firing "[r]ight toward the tent," where Davis and Marquice were standing. By contrast, at trial, Davis testified that defendant was on the scene, but that Davis never observed defendant fire a gun. Both Davis's pretrial statement and grand jury testimony were read into the record at trial.

¶ 50        Detective Michael Hammond testified that both Davis and Antwan had picked defendant out of an in-person lineup. Detective Hammond testified that, on June 30, 2012, at 10:25 p.m., Antwan viewed the lineup and identified defendant as the person who Antwan observed "running from the scene with a handgun in his hand." At 11:47 p.m. the same night, Davis viewed the same lineup and identified defendant as the person "who shot at him." Detective Hammond testified that defendant chose his position in the lineup.

¶ 51        Detective Hammond identified photographs of the lineup. The photos depict five people in the lineup, with defendant standing in position number five, which is the position at the far right. The photos show that, although each man is wearing a baseball cap, their

hairstyles are visible, and defendant is the only person with dreads pulled back into a ponytail. Detective Hammond explained that every person in the lineup was wearing a baseball cap to make the lineup as fair as possible because there were "a variety of haircuts and you can't get fillers that match." Detective Hammond acknowledged that both defendant and the other offender, Sims, had dreads.

¶ 52 Detective Hammond also identified photographs of the lineup from which Ellis picked out Sims as the shooter. The photos show that this lineup had only four people, that Sims was also in the position at the far right, and that Sims was also wearing the same baseball cap that defendant had worn in his lineup.

¶ 53 On cross, Detective Hammond testified that individuals one, two, and three in defendant's lineup had much shorter hairstyles than individuals four and five (defendant). Detective Hammond agreed that, when Ellis picked Sims out of a lineup, Sims was in a similar position, at the far right. Defendant Hammond agreed that, if an alleged offender has dreads, it would be better to have a lineup where everyone has dreads.

¶ 54 Valencia Johnson testified that she was 31 years old and employed as a family leave act specialist. Johnson testified that, in 2012, she was a close friend of defendant, that they had almost daily contact but were not dating, and that he was a member of the Four Corner Hustlers gang. Johnson tried to contact defendant late on the night of December 27 and that, when he eventually texted back, he said he was "at the club." Johnson's call log indicated that she texted him on June 27, 2012, at 11:30 p.m., which would have been after the shooting, and that he replied at 1:19 a.m., in the early morning of June 28.

¶ 55 Jennifer Hanna, who was employed in 2012 as a forensic scientist at the Illinois State Police Crime Laboratory, testified that she tested the 15 empty cartridge cases recovered from

21

the scene and found that 9 cartridges were fired from one gun and 6 cartridges were fired from another gun. Hanna testified that she did not receive a bullet from the morgue, but that, even if she had, she would not have been able to determine if a bullet was fired from the same gun as the cartridge cases without the gun itself, which was not recovered in this case. Additional law enforcement personnel testified at trial, and additional people at the scene testified about their experience of the shooting.

¶ 56   During the State's initial closing argument, the State argued regarding defendant's videotaped statement:

> "You *** know by the defendant's statement that they are working together. What does he tell you in the statement? He tells you that Lance is his partner, that he is watching his back. Watching his back means they are looking out for police. They are making sure that Mafias don't shoot back at them. They are watching each other to keep each other safe.
>
> He also tells you—although this is him minimizing. He also tells you that he flees with the gun that Lance had just done the shooting with, and then he tells you that they meet back up together and he gives the gun back to Lance. But he also says he is a partner just like the police officers.
>
> (Video playing.)
>
> They planned together what they were going to do, they executed together and they fled and they met back up with each other. What more can you ask for? Of course, they are accountable for each other's actions."

¶ 57   Later in the State's initial closing argument, the State again argued:

"You have the defendant's own admissions. The defendant admits he is with Lance at the time of the shooting. He admits that the Mafias had shot them both before and they were going there to find the Mafias. He admits to going through the cut in the gangway so the Mafias wouldn't see them.

He admits to acting as a backup to Lance, acting as partners, watching out for police, watching out for other Mafias. He admits to fleeing with his gun. He admits to meeting up with Lance after the shooting.

The only thing he doesn't admit is that he took that gun and shot that night. As he kept saying, as you saw from the statement, he didn't want to take responsibility for that little girl, but he is responsible for that little girl."

The State argued that defendant was responsible for shooting and "for what Lance did."

¶ 58     With respect to defendant's statement, defense counsel argued in closing:

"The testimony of the video—the statement of the video is I was walking behind this guy going through the cut. I didn't know what he was doing. I didn't know he had a gun until at some point through the gangway."

Defense counsel further argued:

"Counsel said that you know they were working together. Well, there is really—if you remember here, this statement that they attribute—that the law enforcement attributes to [defendant], it wasn't like he was sitting there and they were asking him questions and he was responding.

If you remember, there were long pauses of silence. The two of them—the two officers sitting there. [Defendant] is sitting there very quiet. Unresponsive. But of course [Detective] Swiderek didn't want to put words in his mouth. How many times

did you hear [Detective Swiderek] say that? You know why? Because that's exactly what he was doing. He was putting words in this young man's mouth."

Defense counsel further argued about the videotaped statement:

"That what this case is about, is the accountability of this young man for the action of someone else, and I submit to you, ladies and gentlemen of the jury, there was no plan. We know that because the statement says there wasn't.

Walking through the cut and realizing all of a sudden in the midst as they exit that something bad is about to happen is not a plan."

Defense counsel argued that "we know it is Lance who exits first" because that is what Ellis stated.

¶ 59 After listening to all the evidence, argument, and jury instructions, the jury found defendant guilty. Defendant was later sentenced on January 16, 2020, to a total of 60 years. On January 31, 2020, defendant filed a timely notice of appeal, and this appeal followed.

¶ 60 ANALYSIS

¶ 61 Before discussing the claims raised by defendant, we consider the order in which we should approach them. A court of review should generally refrain from addressing constitutional questions unless the answers are essential to the disposition of a case (*i.e.*, where the case cannot be determined on other grounds). *People v. White*, 2011 IL 109689, ¶ 144. Defendant's first two claims are both constitutional claims, and both attack the admission of his entire confession. His third claim, which simply raises an evidentiary issue, is directed at only a part of the confession. Defendant's last claim is something of a summation in that it argues, in part, that there is doubt because he was denied his right to counsel, which is his second claim. Thus, we address the claims in the order that the parties presented them to us.

¶ 62                                    I. Investigative Alert

¶ 63                                        A. Forfeiture

¶ 64        With respect to the investigative alert claim, defendant argued in his initial brief to this court (1) that his arrest was unconstitutional because it was made pursuant to an investigative alert and (2) that his trial counsel was ineffective for failing to raise this particular ground for suppression in defendant's filed pretrial suppression motion.

¶ 65        In response, the State argued, with respect to issue (1), that it was forfeited and that defendant had failed to argue plain error in his initial brief. In his reply brief, defendant acknowledged that the investigative alert claim was not raised during trial or included in a posttrial motion and that, in his initial brief, "defendant did not specifically state that his forfeiture should be 'excused' based on 'plain error' exception."

¶ 66        A defendant must both specifically object at trial and raise the specific issue again in a posttrial motion in order to preserve an alleged error for appellate review. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50. The advantage to defendant in preserving the error is that, on appeal, the State must prove that the error, if there was one, was harmless beyond a reasonable doubt. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). We provide this incentive because a defendant's failure to object at trial robs the trial court of the opportunity to correct the error, and defendant's failure to object in a posttrial motion deprives this court of the factual findings that a trial court might have made concerning the effect of the alleged error on the weight of the evidence against the defendant and, hence, the possible impact of the error. *Anaya*, 2017 IL App (1st) 150074, ¶ 50. A defendant's failure to do one or both, as is the case here, results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 67    However, it is well established that the State can forfeit a claim of forfeiture by failing to argue it in its appellate brief. *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003); *People v. Knight*, 2020 IL App (1st) 170550, ¶ 47 n.9; *People v. Jones*, 2018 IL App (1st) 151307, ¶ 47 ("The State may forfeit a claim of forfeiture by failing to raise it."); see also *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 29 (for a list of cites to other cases for the same proposition). Thus, in his or her initial brief, a defendant need not preemptively address a forfeiture argument. *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000). In the case at bar, the State raised the issue of forfeiture in its appellate brief, and defendant responded in his reply brief, thereby fully preserving for our review the issue of whether we should find plain error here.[11] Thus, with respect to the investigative alert claim, we consider both (1) plain error and (2) ineffectiveness of counsel. Although plain error and ineffectiveness are two separate paths for considering a claim that a defendant failed to raise before the trial court, it is also generally true that, if there was not the clear or obvious error required for plain error, then there was also no ineffective assistance of counsel. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 58 (since there was no plain error, there was no need to consider the defendant's ineffectiveness claim); *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47.

¶ 68                                   B. Plain Error

¶ 69    When a defendant has failed to preserve an error for appeal, we may still review the issue for plain error. *Sebby*, 2017 IL 119445, ¶ 48; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.").

---

[11]Plain error is explained in full in the section below.

¶ 70        The plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 71        The initial analytical step under either prong of the plain error doctrine is to determine whether there was a clear or obvious error. *Sebby*, 2017 IL 119445, ¶ 49. At all steps of the plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶¶ 51-52. Thus, as a threshold matter, defendant must persuade us that the error he claims occurred at trial was a clear or obvious one. For the following reasons, we cannot find that it was.

¶ 72        The State argues that the jury returned its guilty verdict on April 18, 2019, that *People v. Bass*, 2019 IL App (1st) 160640, the case on which defendant primarily relies, was not first issued until July 25, 2019, and, thus, that his trial counsel could not be faulted for failing to move pretrial or during trial based on it. Since, in this section, we are considering plain error, our focus is not on counsel but rather on the trial court. As we explain below, we cannot find that the trial court erred by not *sua sponte* considering the constitutionality of the investigative alert.

¶ 73        First, while the *Bass* decision was first issued on July 25, 2019, it was later modified on September 30, 2019, upon denial of rehearing and later vacated in part by the supreme court. *Bass*, 2019 IL App (1st) 160640, *affirmed in part and vacated in part by People v. Bass*, 2021 IL 125434, ¶ 33 ("we vacate those portions of the appellate opinion related to *** investigatory

alerts"). Further, the appellate opinion was actually four separate opinions, including a majority opinion of two justices and partial concurrence and partial dissent by one justice filed on July 25, 2019, and a supplemental opinion upon denial of rehearing by two justices followed by the dissent of a different justice when the opinion was modified upon denial of rehearing on September 30, 2019. The justice who partially concurred in the original opinion made clear that she did not concur with the position that defendant cites the case for (*Bass*, 2019 IL App (1st) 160640, ¶¶ 114-15 (Mason, J., concurring in part and dissenting in part)). It is simply not possible to find a clear or obvious error based on a confusing appellate court opinion that was vacated in part by our supreme court.

¶ 74          To the extent that defendant is arguing for a clear or obvious error based not on *Bass* itself but on the reasoning expressed (and later vacated by the Illinois Supreme Court) in *Bass*, he asks us to find a clear or obvious error based on a position that our supreme court has yet to adopt, if they ever will.[12] It is well-settled that the fourth amendment of the United States Constitution (U.S. Const., amend. IV) allows for warrantless arrests, so long as the police have probable cause, and defendant has not challenged probable cause in this case. *United States v. Watson*, 423 U.S. 411, 417 (1976) ("The necessary inquiry, therefore, was not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest."). Realizing that trying to argue for this position under the United States Constitution is "a nonstarter," defendant argues that we should find that the Illinois Constitution extends greater protections than its federal counterpart and that arrests based solely on investigative

---

[12]Please see the next paragraph for a discussion of subsequent cases and subsequent supreme court action.

alerts violate our constitution, although they do not violate federal guarantees.[13] See *Bass*, 2019 IL App (1st) 160640, ¶ 43.

¶ 75    Whether or not this is a position that we or our supreme court should adopt is a separate question from whether a clear or obvious error occurred at defendant's trial when this unbriefed, unargued issue was not *sua sponte* considered. Our supreme court has admonished its appellate courts "that an appellate court cannot correct an 'error' unless the error is clear or obvious *under current law*." (Emphasis added.) *People v. Givens*, 237 Ill. 2d 311, 329 (2010). If "there is no indication that any error was obvious under current law," then an appellate court should refrain from acting. *Givens*, 237 Ill. 2d at 329. Under this definition of "clear or obvious," we cannot find a clear or obvious error here, where defendant is arguing for an extension of, or a new finding about, existing law. *People v. Wimberly*, 2023 IL App (1st) 220809, ¶ 17 (*Bass*'s "reasoning" and holding were "novel").

¶ 76    Long after defendant was found guilty in the instant case, at least one appellate panel adopted the position stated by the majority in the vacated portion of *Bass*, and at least one appellate panel disagreed with it. Compare *People v. Smith*, 2022 IL App (1st) 190691, ¶¶ 53, 99 (holding a warrantless arrest based on an investigative alert violates the Illinois Constitution), with *Wimberly*, 2023 IL App (1st) 220809, ¶¶ 20, 26 (rejecting *Bass*'s holding that a warrantless arrest made pursuant to an investigative alert violates the Illinois Constitution); see also *Smith*, 2022 IL App (1st) 190691, ¶ 65 (listing "a number of other panels of this court [that] disagreed with *Bass*'s conclusion that investigative alerts were unconstitutional"). Our supreme court granted leave to appeal from *People v. Dossie*, 2021 IL

---

[13]Defendant states in his brief to this court that "the constitutional question presented here has yet to be properly presented to this [c]ourt." While he argues that this court has previously questioned the validity of arrests based on investigative alerts, he notes that "these criticisms generally occur in concurrences," rather than majority opinions.

App (1st) 201050-U, ¶ 1, an unpublished order filed under Illinois Supreme Court Rule 23(b) (eff. Jan. 1, 2021), that held that "the use of an investigative alert did not invalidate the arrest." On February 2, 2023, our supreme court dismissed the *Dossie* appeal, in a *per curiam* opinion which observed that two justices had recused themselves and that "the remaining members of the court are divided so that it is not possible to secure the constitutionally required concurrence of four judges for a decision." *People v. Dossie*, 2023 IL 127412, ¶ 1. The court explained: "The effect of this dismissal is the same as an affirmance by an equally divided court of the decision under review but is of no precedential value."[14] *Dossie*, 2023 IL 127412, ¶ 1. As a result, no definitive supreme court opinion on this issue has yet been issued. However, a future supreme court opinion, either way, will have no effect on the outcome here since the question before us concerns then-current law. *Givens*, 237 Ill. 2d at 329 (the error must be clear or obvious under then-current law).

¶ 77                              C. Ineffective Assistance

¶ 78            To determine whether defendant was denied his right to effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that the outcome of the proceeding would have been different. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 71.

---

[14]We draw no inferences or conclusions from the court's inability to agree on this issue since the opinion specifically states that it has no precedential value.

¶ 79    Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72; see also *People v. English*, 2013 IL 112890, ¶ 34 (counsel's assessment of the merits of an issue "depends on the state of the law at the time" of the assessment). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotation marks omitted.) *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 80    To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. Thus, if one of the two prongs is missing, we need not consider the other one. In addition, our analysis does not have to proceed in a particular order. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73.

¶ 81    We cannot find that counsel's performance fell below prevailing professional norms for failing to raise an issue, as we discussed above, (1) where the principal supporting case was issued after the guilt phase of the trial was complete, and (2) where he would have been arguing for an extension of current law or, at the very least, for a position that our highest court has not taken. This position cannot be said to be "prevailing" or the "norm" at the time of defendant's trial, and thus, counsel's performance did not fall below prevailing norms in not asserting it. *People v. Domagala*, 2013 IL 113688, ¶ 36 ("a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms"). Since

defendant cannot establish the first prong of the *Strickland* test, he cannot establish a *Strickland* claim. See *People v. Roberts*, 2020 IL App (1st) 172262, ¶ 28 (counsel's performance is viewed, not in hindsight, but from the time of the performance); *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79; *People v. Becerril*, 307 Ill. App. 3d 518, 524 (1999) ("Defendant bears the burden of proving that counsel's representation was unreasonable under current prevailing professional norms ***.").

¶ 82                                    II. Right to Counsel

¶ 83          Defendant claims that the police violated his right to counsel and, therefore, his confession must be suppressed.

¶ 84                                         A. Issues

¶ 85          Prior to custodial questioning, a person must be clearly informed that he has, among other rights, the right to consult with an attorney and the right to have an attorney present with him during the interrogation. *Florida v. Powell*, 559 U.S. 50, 53 (2010) (discussing the "pathmarking decision, *Miranda v. Arizona*, 384 U.S. 436, 471 (1966)"). After an accused has "expressed his desire to deal with the police only through counsel," he may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

¶ 86          In this appeal, it is undisputed that defendant was in custody and that he invoked his right to counsel. However, the trial court found that defendant reinitiated contact by knocking on the door of his holding cell in order to attract Detective Wood's attention.

¶ 87          In his initial brief to this court, defendant argued that "the critical question is whether [defendant's] actions reinitiated conversations" and that the trial court erred by so finding. In

his initial brief, defendant contended that the trial court erred because defendant knocked on the door in order to ask to call his lawyer and that this did not amount to reinitiating contact. Defendant declared that, "although [defendant] technically *initiated* the subsequent conversation with \*\*\* Wood by knocking on the door, a request for a lawyer certainly" cannot be construed as a generalized willingness for conversation.

¶ 88    However, in its appellate brief, the State noted that, immediately after knocking on the door, defendant did not ask to call his attorney but instead asked Detective Wood if he had been identified in a lineup.

¶ 89    In his reply brief, defendant acknowledged that he did ask Detective Wood, first, about whether he was picked out of a lineup and that it was only later in the conversation with her that he mentioned calling his attorney. However, he argued that his reason for knocking was still to ask for an attorney and that his later statement that he wanted to call an attorney was, itself, an "unequivocal invocation of the right to speak with [an] attorney," which Detective Wood did not honor.

¶ 90    Thus, defendant raises two issues for our consideration: (1) whether the trial court erred in finding that defendant's knocking on the door to attract Detective Wood's attention was a reinitiation of contact by defendant and (2) whether defendant's subsequent statement, after reinitiating contact, was, itself, an invocation of the right to counsel that Detective Wood did not honor. Although the second issue was articulated more clearly in his reply brief than in his initial brief, we find that it was sufficiently articulated in his initial brief, so as not to be forfeited—for the reason explained in the paragraph below. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued in the appellant's initial brief "are forfeited and shall not be raised in the reply brief").

¶ 91 　　　　　When a defendant has asserted the right to counsel but nonetheless speaks to the police, the burden is on the State to show both (1) initiation and (2) waiver. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983) (plurality opinion); *Bradshaw*, 462 U.S. at 1054 n.2 (Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.).[15] This two-part test, articulated in *Bradshaw*, requires two separate and distinct inquiries. *Bradshaw*, 462 U.S. at 1045 (plurality opinion) ("The inquiries are separate, and clarity of application is not gained by melding them together."); *Bradshaw*, 462 U.S. at 1054 n.2 ( Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.). The first inquiry is whether an accused indicated a desire "to open up a *** generalized discussion relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045 (plurality opinion); *Bradshaw*, 462 U.S. at 1055 ( Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.) ("an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation"). The second inquiry is whether a knowing and intelligent waiver of the right to counsel occurred, based on the totality of the circumstances. *Bradshaw*, 462 U.S. at 1046 (plurality opinion); *Bradshaw*, 462 U.S. at 1054 n.2 ( Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.). The State asserts that defendant failed to address the second inquiry and, thus, "waived his opportunity

---

[15]Although *Bradshaw* was a plurality opinion, eight of the nine justices agreed that a two-step inquiry was required and that the two steps were separate steps. *Bradshaw*, 462 U.S. at 1048-49 (Powell, J., concurring in the judgment) (quoting from the dissent and the plurality to stress their similarities); *Bradshaw*, 462 U.S. at 1054 n.2 (Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.) ("eight Justices manifestly agree"). In *Bradshaw*, four justices reversed in a plurality opinion, four justices dissented, and one justice, Justice Powell, concurred in the judgment of the reversing plurality but wrote separately to explain the reasons for his concurrence. In his concurrence, Justice Powell quoted from both the dissent and the plurality to show how they agreed on the two-step analysis and that the steps were separate. *Bradshaw*, 462 U.S. at 1048-49 (Powell, J., concurring in the judgment). The difference between them lay in their view of the facts. The dissent was "baffled" at "the plurality's application of that standard to the facts of this case." *Bradshaw*, 462 U.S. at 1055 ( Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.). The plurality reversed the state appellate court that had reversed the trial court; so, in essence, the plurality affirmed the trial court's finding that there was no *Bradshaw* violation.

to argue the second prong of *Bradshaw*'s two-part inquiry." However, defendant's initial brief argued that defendant "requested a lawyer again," and his brief quoted the second *Bradshaw* inquiry, as phrased in our supreme court's case of *People v. Olivera*, 164 Ill. 2d 382, 390 (1995) (citing *Bradshaw*, 462 U.S. at 1044 (plurality opinion)). Thus, we do not find the second *Bradshaw* prong forfeited for our consideration.

¶ 92                                    B. Standard of Review

¶ 93        We apply a two-part standard of review to a trial court's ruling on a suppression motion under *Bradshaw*. *E.g.*, *People v. Doehring*, 2021 IL App (1st) 190420, ¶ 81. In general, we will not disturb the trial court's factual findings unless they are against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate legal ruling on whether the evidence should be suppressed. *E.g.*, *Doehring*, 2021 IL App (1st) 190420, ¶ 81.

¶ 94        However, "where there is no factual or credibility dispute and the question involves only the application of the law to the undisputed facts, our standard of review is *de novo*." *People v. Rockey*, 322 Ill. App. 3d 832, 836 (2001); see also *People v. Sims*, 192 Ill. 2d 592, 615 (2000) ("Because the present case involves the application of the law to undisputed facts, our standard of review is *de novo*."). In addition, where the trial court relied on a video of the defendant's interview, which this court has also reviewed, any discrepancies between the video and the officer's later testimony about it "must be resolved in favor of what the video shows," and our review of the video is *de novo*. *People v. Firestine*, 2019 IL App (5th) 180264, ¶ 15.

¶ 95                                    C. First *Bradshaw* Prong

¶ 96        We cannot find that the trial court erred by finding that defendant initiated contact when defendant knocked on the holding cell's door and then asked whether he was selected in the lineup.

¶ 97     In *Bradshaw*, five out of the nine justices found that the defendant had knowingly and intelligently waived his right to counsel on the following facts. *Bradshaw*, 462 U.S. at 1046; *Bradshaw*, 462 U.S. at 1051 (Powell, J., concurring in the judgment). After invoking his right to counsel, the defendant in *Bradshaw* was transferred to another jail. Either before or during the transfer, the defendant asked a police officer: " 'Well, what is going to happen to me now?' " *Bradshaw*, 462 U.S. at 1042 (plurality opinion).

¶ 98     In *Bradshaw*, the officer responded by saying:

> " 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will.' " *Bradshaw*, 462 U.S. at 1042.

¶ 99     Four justices found "There can be no doubt in this case that in asking, 'Well, what is going to happen to me now?', [the defendant] 'initiated' further conversation in the ordinary dictionary sense of that word." *Bradshaw*, 462 U.S. at 1045. They explained, that "[a]lthough ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045-46.

¶ 100     The fifth concurring justice, Justice Powell, did not opine about the initiating question alone, but rather focused on the fact that it was "not an isolated event" and that "[i]t was immediately followed by a renewal of *Miranda* warnings." *Bradshaw*, 462 U.S. at 1049 (Powell, J., concurring in the judgment). As a result, he agreed that the defendant "knowingly and intelligently waived his right to counsel." *Bradshaw*, 462 U.S. at 1051.

¶ 101　　　　　　However, about a decade after *Bradshaw*, the Illinois Supreme Court found in *People v. Olivera*, 164 Ill. 2d at 390-91, that "the defendant's question 'What happened?' posed to [an officer] immediately following the conclusion of the lineup cannot be said to evince on the defendant's part a willingness and a desire for a generalized discussion concerning the investigation."

¶ 102　　　　　　In *Olivera*, the defendant asked, " 'What happened?' ", and in *Bradshaw* the defendant similarly asked: " 'Well, what is going to happen to me now?' " Compare *Olivera*, 164 Ill. 2d at 390-91, with *Bradshaw*, 462 U.S. at 1042 (plurality opinion). However, in *Olivera*, our supreme court found no initiation, while in *Bradshaw*, the four justices in the plurality opinion did find initiation. Compare *Olivera*, 164 Ill. 2d at 390-91, with *Bradshaw*, 462 U.S. at 1045-46.

¶ 103　　　　　　Our supreme court distinguished *Bradshaw* by noting that, in *Bradshaw*, the officer immediately responded with warnings that the defendant did not have to speak to him, whereas the officer in *Olivera* answered the defendant's question which the officer "should have known would be reasonably likely to elicit an incriminating response from the defendant." *Olivera*, 164 Ill. 2d at 391-92. Based on this difference, the *Olivera* court concluded, "we hold that the defendant did not initiate the conversation *in a manner* evincing a willingness and desire for a generalized discussion concerning the investigation." (Emphasis added.) *Olivera*, 164 Ill. 2d at 392. Since the *Olivera* court found the first prong of *Bradshaw* satisfied, it had no "need" to consider the second prong. *Olivera*, 164 Ill. 2d at 392.

¶ 104　　　　　　In the case at bar, defendant argues that, "although [defendant] technically *initiated* the subsequent conversation with [the officer] by knocking on the door," he cannot be said to have

evinced a willingness and desire for a generalized discussion. Defendant argues that, in this way, his case is "on all fours with *Olivera*."

¶ 105   However, there is a big difference between his case and *Olivera* which defendant overlooks—namely, that Wood immediately responded with the warnings that the officer in *Olivera* did not give, but that the officer in *Bradshaw* did. Unlike the officer in *Olivera*, Wood did *not* answer defendant's question but instead immediately told him "I can't talk to you."

¶ 106   In *Bradshaw*, the officer responded: " 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will.' " *Bradshaw*, 462 U.S. at 1042. Similarly, in our case, Wood responded: "You said you don't want to talk to us, so I can't talk to you unless I read you your rights and you want to talk to me." It was the officer's response that our supreme court found crucial in *Olivera* in order to distinguish *Olivera* from *Bradshaw*. *Olivera*, 164 Ill. 2d at 391-92. Thus, we find that, in the first or initial part of the interaction with Detective Wood, defendant acted in a manner that would convey to a reasonable officer that defendant had a desire for a discussion about his case, in that he knocked on the door to get Detective Wood's attention and specifically asked for the result of the lineup, and Detective Wood responded immediately with a cautionary "I can't talk to you." See *Bradshaw*, 462 U.S. at 1045-46 (the defendant's question "could reasonably have been interpreted by the officer as relating generally to the investigation").

¶ 107                   D. Second *Bradshaw* Prong

¶ 108   Next, we proceed to consideration of the second prong of *Bradshaw*: whether the defendant made a knowing and intelligent waiver of his right to counsel in light of the totality of the circumstances. *Bradshaw*, 462 U.S. at 1046; *Bradshaw*, 462 U.S. at 1054 n.2 (Marshall,

J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.). *Olivera* did not need to apply the second prong to the facts before it, but *Bradshaw* did.

¶ 109    The four justices in the *Bradshaw* plurality observed that this determination depended upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. *Bradshaw*, 462 U.S. at 1046 (plurality opinion) (citing *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979), citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). They also observed that, in the case before it, the police had made no threats, promises, or inducements to talk and that defendant was properly advised of his rights. *Bradshaw*, 462 U.S. at 1046, Similarly, the fifth concurring justice agreed that "the facts and circumstances, when viewed in their entirety, clearly establish a valid waiver of the right to counsel." *Bradshaw*, 462 U.S. at 1050 (Powell, J., concurring in the judgment).

¶ 110    In this appeal, defendant does not make arguments based on his background, and he does not claim either that the police made threats or promises or that he was improperly advised of his rights by Detective Wood.[16] Thus, these issues are not before us. Instead, he argues that his conduct in repeatedly asserting his right to counsel established that he did not knowingly and intelligently intend to waive this right.

¶ 111    Defendant invoked his right to counsel three times in less than 24 hours. Almost immediately after his postarrest arrival at Area North, Detective Swiderek read defendant his *Miranda* rights and defendant immediately invoked his right to counsel. That was at 11:28 p.m. on June 29, 2012. A few hours later, at 5:16 p.m., on June 30, 2012, defendant again asked for counsel, specifically asking Detective Hillman whether his attorney had arrived yet. At 7:20

_____

[16]The State asserts that Wood read defendant his Miranda rights, and defendant does not contest that statement. Thus, the issue of whether those Miranda warnings were complete is not an issue in front of us.

p.m., defendant knocked on the door of the interview room where he was being held. Detective Wood responded, and he told her he wanted to call his attorney.

¶ 112    When defendant said he wanted a phone call, Detective Wood said he would get a phone call, without saying when. When defendant asked "[w]hen?," Detective Wood replied with almost a non-answer: "Soon as we're done here." Defendant asked again, "[d]one with what?," and Detective Wood did not answer that. Defendant then said, clear as day: "I want to call my lawyer." Based on the facts and circumstances of this case, namely, defendant's repeated requests for counsel that were, from his perspective, ignored, no one would think he was knowingly and intelligently waiving his right to counsel, but rather that he had begun to believe that he did not have a right. These actions contrast with *Bradshaw* where, " 'within a short time after requesting an attorney [the *Bradshaw* defendant] changed his mind.' " *Bradshaw*, 462 U.S. at 1046 (plurality opinion). In the case at bar, the circumstances establish that, after repeatedly seeking counsel for close to 24 hours, defendant did not so much change his mind as give up.

¶ 113    As the United States Supreme Court observed decades ago in the landmark case of *Escobedo v. Illinois*, 378 U.S. 478, 485 (1964), " '[i]t cannot be doubted that, placed in the position in which the accused was when the statement was made to him' " that others had charged him with the crime, " 'the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person.' " Defendant, "a layman, was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots." *Escobedo*, 378 U.S. at 486. "This was the 'stage when legal aid and advice' were most critical" to defendant. *Escobedo*,

378 U.S. at 486 (quoting *Massiah v. United States*, 377 U.S. 201, 204 (1964). Similarly, in the case at bar, the stage where legal aid and advice were most critical here was, as we noted above (*supra* ¶ 18), when the detectives advised defendant: "there was a difference between shooting the little girl, alright, and watching his back, and taking the gun, and running with the gun. That's a big difference, okay? That's a big difference. That's like what we're talking about intent." The detective assured defendant, "I'm not talking about [you] going down for that little girl." *Supra* ¶ 19.

¶ 114    Nevertheless, we accept the trial court's credibility determination that Dunham's testimony was incredible. *Supra* ¶¶ 39, 41. The trial court found that Dunham's testimony was sprinkled throughout "with I don't remembers," and the transcript substantiates the court's finding. In addition, we are mindful of the fact that a reviewing court owes great deference to a credibility determination made by a trial court after observing a witness's demeanor "first-hand." *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 142; *People v. Colon*, 2018 IL App (1st) 160120, ¶ 66 (a reviewing court owes great deference to a trial court's credibility determinations made after observing a witness's "demeanor first-hand"); *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) ("the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony"). Thus, we cannot find that the trial court's credibility determination regarding Dunham was against the manifest weight of the evidence. *E.g.*, *Doehring*, 2021 IL App (1st) 190420, ¶ 81; *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 102 (a factual finding is against the manifest weight of the evidence if it is unreasonable, arbitrary, or not based on the evidence). However, defendant's repeated requests for counsel are well-documented and beyond dispute, despite the trial court's credibility finding as to his counsel.

¶ 115      The State bears a high burden in proving that a defendant's waiver of a right, after repeated assertions of that right, was knowing and voluntary, and the State has not satisfied its burden in this case. See *Olivera*, 164 Ill. 2d 382. Depending, as it does, on an undisputed chronology of dates, times, and statements (*supra* ¶¶ 111-12), our determination is made pursuant to *de novo* review. *Sims*, 192 Ill. 2d at 615 ("Because the present case involves the application of the law to undisputed facts, our standard of review is *de novo*."); *Rockey*, 322 Ill. App. 3d at 836 ("where there is no factual or credibility dispute and the question involves only the application of the law to the undisputed facts, our standard of review is *de novo*"). In addition, we apply *de novo* review to the trial court's ultimate legal ruling on whether the evidence should be suppressed and find that it must be reversed. *E.g.*, *Doehring*, 2021 IL App (1st) 190420, ¶ 81.

¶ 116                                    E. Not Harmless

¶ 117      The next issue is whether this error was harmless beyond a reasonable doubt, and the burden is on the State to persuade us that it was. *Thurow*, 203 Ill. 2d at 363 (in a harmless error analysis, the burden is on the State to persuade the appellate court).[17] In its brief to this court, the State cites *People v. Patterson*, 217 Ill. 2d 407, 428 (2005), to argue that "the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict." For the reasons discussed below, we find that the State has not carried its burden of persuasion on this critical question.

¶ 118      First, the State argues that defendant's videotaped statement was but one part of an overwhelming body of evidence. Defendant was not arrested at the scene, and there was no

---

[17]The State acknowledges that defendant preserved this error for appellate review by timely objection in the court below and that, as a result, harmless error analysis applies. See generally *supra* ¶ 66 (regarding the harmless error doctrine).

forensic evidence connecting him to the crime. The overwhelming evidence, according to the State, is principally the "eyewitness evidence" obtained from Davis and Antwan. This eyewitness evidence consisted of their pretrial statements, lineup identifications, and grand jury testimony. However, Davis and Antwan, the only two eyewitnesses who identified defendant, recanted at trial. The photos of the lineups showed that defendant was the only person with long dreads, when dreads were a distinctive feature of the offenders. Detective Hammond testified that, to address this problem, which he acknowledged was a fairness issue, the police gave the lineup participants baseball caps to wear. However, as the photos show, the hairstyles were still distinctly visible. Thus, we find the body of evidence, upon which the State relied, was flawed, to say the least, and far from overwhelming.

¶ 119     More important than the odd lineup and the recanted eyewitness statements is the fact— as our supreme court has repeatedly held—that " 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *People v. Simpson*, 2015 IL 116512, ¶ 36 (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985)); *People v. Patterson*, 154 Ill. 2d 414, 436 (1992) ("a confession may be the most probative and damaging evidence that can be admitted against a defendant" (internal quotation marks omitted)); see also *People v. Gharrett*, 2022 IL App (4th) 210349, ¶ 55 (the defendant's videotaped statements "provided persuasive evidence of defendant's guilt").

¶ 120     Second, the State argues in its brief that "the prosecution emphasized this eyewitness evidence in closing argument, even more so than it emphasized defendant's custodial statements." However, as the quotes above (*supra* ¶¶ 56-58) from closing arguments show, defendant's videotaped statements were central to both the State's and the defense's closing arguments. In fact, after playing a video clip *in its closing*, the State argued: "They planned

together what they were going to do, they executed together, and they fled, and they met back up with each other. What more can you ask for?"

¶ 121　　　　Lastly, in its brief, the State cites in support *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 48, in which the appellate court found that there was no error in the admission of defendant's videotaped confession and that, even if there was, the other "evidence presented at trial, aside from the videotaped confession, overwhelmingly established the defendant's guilt." The court explained that "the use of [the defendant's] videotaped confession at trial was harmless error, where it was merely duplicative of the oral incriminating statement he gave to the police during his transport to Area One after his arrest—which was testified to by [a detective] at trial." *Kronenberger*, 2014 IL App (1st) 110231, ¶ 48. In stark contrast to *Kronenberger*, the videotaped statements that defendant made in the case at bar were the only incriminating statements that he made. Thus, *Kronenberger* is not persuasive here.

¶ 122　　　　Having carefully considered the State's harmless-error arguments, we do not find that the State carried its burden of persuasion on this issue.

¶ 123　　　　　　　　　　　　　　　CONCLUSION

¶ 124　　　　For the foregoing reasons, we find (1) that the State failed to satisfy its burden under the second *Bradshaw* prong to show, in light of the totality of the circumstances, that defendant made a knowing and intelligent waiver of his right to counsel (*Bradshaw*, 462 U.S. at 1046; *Bradshaw*, 462 U.S. at 1054 n.2 (Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.)) and (2) that the State failed to establish that the trial court's failure to suppress the resulting evidence was harmless error (see *Thurow*, 203 Ill. 2d at 363). Thus, we have no choice but to reverse and remand for a new trial.

¶ 125　　　　Reversed and remanded.

¶ 126   JUSTICE TAILOR, specially concurring:

¶ 127   I write separately because although I agree with the majority's ultimate conclusion that the trial court erred in denying Dorsey's motion to suppress, I do so for different reasons. The majority has identified two separate issues relating to Dorsey's motion to suppress for our consideration: "(1) whether the trial court erred in finding that defendant's knocking on the door to attract Detective Wood's attention was a reinitiation of contact by defendant and (2) whether defendant's subsequent statement, after reinitiating contact, was, itself, an invocation of the right to counsel that Detective Wood did not honor." *Supra* ¶ 90.

¶ 128   With respect to the first issue, the majority concludes that Dorsey reinitiated contact with detectives when he knocked on the door and asked Detective Wood if he had been identified in the line-up. *Supra* ¶ 96. I agree with this finding. The majority then concludes that Dorsey did not knowingly and intelligently waive his right to counsel before making inculpatory statements to detectives. *Supra* ¶ 115. Based on the record before me, I find it unnecessary to reach this issue because, after reinitiating contact with Detective Wood, Dorsey unequivocally invoked his right to counsel before making any incriminating statement. In my opinion, the issue of whether Dorsey's motion to suppress should have been granted turns on whether Dorsey invoked his right to counsel during his conversation with Detective Wood. Although the majority has identified this issue as the second question before us, it does not address it.

¶ 129   The video in this case clearly lays out the sequence of events, which the majority has partially quoted. In summary, Dorsey knocked on the door and Detective Wood entered. Dorsey asked whether he was identified in a lineup. Detective Wood informed Dorsey she could not talk to him unless she read Dorsey his rights and Dorsey wanted to talk. Dorsey

asked for clarification about his "rights" and Detective Wood began reciting his *Miranda* rights. She got partly through his *Miranda* rights by reciting them from her memory and then asked Dorsey if he wanted to talk. She told him if he did, she would read him his rights from "the book," but if Dorsey did not want to talk to her, then she could not talk to him. The following conversation occurred:

"DEFENDANT: Do I get a phone call?

WOOD: You'll get a phone call.

DEFENDANT: When?

WOOD: Soon as we're done.

DEFENDANT: Done with what?

WOOD: Who—who do you want to call?

DEFENDANT: I want to call my lawyer.

WOOD: Ok, wait. Hold on one second. Do you want to talk to me? Do you want me to come back?

DEFENDANT: Yeah.

WOOD: Ok, give me two seconds. [Wood exits.]"

¶ 130      Detective Wood reentered the room several minutes later. The following exchange occurred:

"WOOD: Okay, I told you your rights, right?

DORSEY: Yes.

WOOD: I'm gonna tell it to you again just so we're clear, 'cause you said you didn't want to—

DORSEY: Okay.

46

WOOD:—to me before. Okay? Are you all right?

DORSEY: Yes, cold. I'm cold.

WOOD: You're cold. Really? I'll see if I can get you a sweater or something.

DORSEY: Thank you so much.

WOOD: Okay. You have the right to remain silent. Anything you say can and will be used against you. Do you understand that?

DORSEY: Yeah.

WOOD: You have a right to ask for an attorney. If you cannot afford an attorney one will be provided for you, do you understand that?

DORSEY: Yeah.

WOOD: If at any time when we're talking and you decide you don't want to talk to me anymore, you can tell me I don't want to talk to me anymore and I will stop talking. You understand that?

DORSEY: (INDICATING)

WOOD: Understanding all these rights do you want to talk to me?

DORSEY: Yeah.

WOOD: Okay.

DORSEY: I want to know what's going on.

WOOD: You know why you're here?

DORSEY: Something about a little girl or something.

WOOD: What, what about a little girl?

DORSEY: I don't know see I was—I was at a club.

WOOD: Uh-huh.

DORSEY: And I—

WOOD: Okay. You telling me that you don't know I know you're lying.

DORSEY: Huh?

WOOD: You understand that, you telling me you don't know 'cause everybody know[s] what's going on with the little girl. So tell me what's going on.

DORSEY: Yeah I heard it I heard I heard about the little girl."

¶ 131      There is no question that Dorsey initiated a conversation with Detective Wood by knocking on the door and asking if he had been identified. However, after Detective Wood recited the *Miranda* warnings to Dorsey from memory, Dorsey immediately and unequivocally re-invoked (recall that he had invoked his right to counsel on two prior occasions while in police custody) by asking to call his lawyer. This subsequent invocation renders the confession that followed inadmissible.

¶ 132      A criminal defendant has a constitutional right to counsel at all custodial interrogations, as provided by both the United States and Illinois Constitutions. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10; *People v. Flores*, 315 Ill. App. 3d 387, 392 (2000). To invoke the *Miranda* right to counsel, a defendant must be in custody and subject to interrogation or under imminent threat of interrogation. *People v. Villalobos*, 193 Ill. 2d 229, 241-42 (2000). Once a defendant invokes that right, the police cannot interrogate him further unless the accused initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The *Edwards* rule is designed to prevent the police from badgering a defendant into waiving his previous assertion of his right to counsel. *People v. Woolley*, 178 Ill. 2d 175, 198 (1997). Thus, if the police subsequently initiate a conversation with the accused in the absence of counsel, the accused's statements are presumed involuntary

and are inadmissible as substantive evidence at trial. *Id.* Any waiver of the right to counsel given in a discussion initiated by the police is presumed invalid. *Id.*

¶ 133        In applying the *Edwards* rule, we must first determine whether the defendant invoked his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95 (1984). When determining whether a defendant invoked his right to counsel, we must use an objective inquiry, "which at a minimum requires some statement that reasonably can be construed as an expression of a desire for counsel." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 69 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). If a defendant's reference to his attorney is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel," the interrogation does not need to stop. (Emphasis omitted.) *Davis*, 512 U.S. at 459. However, in making a request for counsel, "[t]he defendant need not articulate his desire in the manner of a Harvard linguist, but he must articulate his desire in a clear enough manner that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010) (citing *Davis*, 512 U.S. at 459).

¶ 134        It is clear from the video that almost immediately after Dorsey reinitiated contact with Detective Wood, and immediately after Detective Wood partially Mirandized him, Dorsey invoked his right to counsel by asking to call his lawyer. In fact, the majority has acknowledged this reinvocation, stating that, "[d]efendant invoked his right to counsel three times in less than 24 hours." *Supra* ¶ 111. The third time was "[a]t 7:20 p.m., [when] defendant knocked on the door of the interview room where he was being held. Detective Wood responded, and he told her he wanted to call his attorney." Supra ¶ 111.

¶ 135    In my view, Dorsey's request to call his lawyer is an unambiguous and unequivocal invocation of his right to counsel under *Edwards*. A reasonable officer under those circumstances "would have understood the [inquiry] to be a request for an attorney." *In re Christopher K.*, 217 Ill. 2d 348, 381 (2005). As the statement met the "requisite level of clarity," Dorsey should not have been "subject to further questioning until a lawyer ha[d] been made available or the suspect himself reinitiate[d the] conversation." *Davis*, 512 U.S. at 458-59. As noted above, this second layer of protection is " 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' " *Id.* at 458 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)).

¶ 136    Courts have come to the same conclusion under analogous facts. In *Smith*, 469 U.S. at 92, officers took the defendant into an interrogation room for questioning. When the defendant was informed of his right to consult with an attorney and have him present during questioning, the defendant replied, " 'Uh, yeah, I'd like to do that.' " (Emphasis omitted.) *Id.* at 93. Rather than curtailing the questioning, the officer finished reading the *Miranda* rights aloud and then asked the defendant, " 'Do you wish to talk to me at this time without a lawyer being present?' " *Id.* The defendant replied, " 'Yeah and no, uh, I don't know what's what, really,' " and then agreed to answer questions without counsel being present. (Emphasis omitted.) *Id.* The Supreme Court held that the defendant's initial response constituted an unequivocal request for counsel and that, under the bright-line rule stated in *Edwards*, "all questioning must cease after an accused requests counsel." (Emphasis omitted.) *Id.* at 98.

¶ 137    In *Schuning*, 399 Ill. App. 3d at 1075-77, police officers questioned the defendant after reading him his *Miranda* rights while the defendant was in the hospital's intensive care unit (ICU). Later that day, the defendant asked an officer for a phone to call his attorney but was

informed by a nurse that phones could not be used in the ICU. *Id.* at 1075. The defendant fell asleep and never made the call. *Id.* Officers returned to the hospital the following day and re-administered the *Miranda* warnings. *Id.* at 1077. The defendant then answered questions about the double murder. *Id.*

¶ 138     The State appealed the trial court's ruling suppressing the defendant's confession, claiming that the words used by the defendant did not invoke the right to counsel but were ambiguous where the reason underlying the defendant's wish to call his attorney was unknown. *Id.* at 1081, 1086. This court disagreed, finding that the defendant's request was an unambiguous invocation of his right to counsel. *Id.* at 1086. We noted that the defendant did not inquire whether he should call his lawyer or ponder whether he required counsel but unequivocally asked to call his lawyer, and that request was ignored. *Id.* The defendant "was not to be subjected to further interrogation until counsel had been made available to him unless he validly waived his earlier request by initiating contact." *Id.* at 1080-81. Therefore, the incriminating statements that the defendant made during the interviews after he asked to call his attorney were inadmissible. *Id.* at 1081, 1086.

¶ 139     In *People v. Eichwedel*, 247 Ill. App. 3d 393, 395 (1993), while being interviewed, the defendant asked the officer if he could call " 'Jeff Williams.' " Rather than discontinuing questioning, the officer asked the defendant if he knew a criminal attorney, to which the defendant stated that he did not and asked what would happen if he called a criminal attorney. *Id.* at 395-96. Despite conflicting testimony on this point, the trial court found that the defendant had identified Jeff Williams as an attorney. *Id.* at 395-98. Nevertheless, the trial court denied the defendant's motion to suppress because it was " 'not convinced that [the defendant] persisted in [his inquiry for an attorney] or made it perfectly clear that he didn't

want to talk anymore unless he could talk to Jeff Williams.' " *Id.* at 396-98. On appeal, we held that once the defendant asked to call his attorney, all questioning should have ceased because his request was sufficient to invoke his right to counsel. *Id.* at 397-98. As such, we reversed the trial court's denial of the defendant's motion to suppress. *Id.* at 399.

¶ 140 Like the defendants in *Smith*, *Schuning*, and *Eichwedel*, Dorsey made an unambiguous, unequivocal request for counsel after Detective Wood partially informed him of his *Miranda* rights. Dorsey's clear and unequivocal invocation of his right to counsel obviates his earlier reinitiation of contact with detectives to talk about the case. Dorsey had already invoked his right to counsel twice during his detention. When Dorsey stated he wanted to call his attorney, he "articulate[d] his desire in a clear enough manner that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *Schuning*, 399 Ill. App. 3d at 1082. All questioning should have ceased at this point.

¶ 141 I also find that Dorsey did not reinitiate contact with Detective Wood after he invoked his right to counsel. The determination of whether an accused initiated further discussion with the police after invoking his right to counsel involves the application of a two-part inquiry. *Woolley*, 178 Ill. 2d at 198 (citing *Bradshaw*, 462 U.S. at 1044-45 (plurality opinion)). First, after invoking the right to counsel, the accused must initiate further discussion. *Id.* The defendant must make a statement that evinces a " 'willingness and a desire for a generalized discussion about the investigation.' " *Id.* Second, if the defendant did reinitiate contact with the police, the inquiry is whether the defendant knowingly and intelligently waived his right to counsel. *Id.* at 199.

¶ 142 Here, Dorsey did not make a statement that suggested a " 'willingness and a desire for a generalized discussion about the investigation' " after invoking his right to counsel. See *id.*

at 198. Dorsey merely answered Detective Wood's subsequent questions. The video plainly shows that after Dorsey reinvoked his right to counsel by asking to call his lawyer, it was Detective Wood, not Dorsey, that initiated further discussion. Detective Wood asked Dorsey, "Do you want to talk to me? Do you want me to come back?" Dorsey responded, "Yeah." Dorsey's single, unequivocal request for counsel required Detective Wood to cease questioning Dorsey, even about his desire to speak with her, unless and until Dorsey affirmatively reinitiated the conversation. See *People v. Coleman*, 2021 IL App (1st) 172416, ¶ 100 ("Defendant did not initiate further conversation with the detectives but responded to the detectives' question, asking whether he no longer wished to speak with them. To the extent that the detectives were questioning whether defendant was asserting his right to remain silent, and defendant responded to that question by stating that he previously told the police what he knew, defendant did not initiate further discussions with the detectives or 'undo' his previous assertion of his right to counsel.")

¶ 143          Citing *Davis*, the State argues that subsequent, clarifying questions, like the ones Detective Wood asked Dorsey, are permissible because Detective Wood was attempting "to clarify what defendant wanted to do under the circumstances, where he had just expressed a willingness to discuss the case by asking about the line-up, and then in the next breath announced that he wanted to contact a lawyer." However, the State's reliance on *Davis* is misplaced. *Davis* allows for follow up questions for clarification when the defendant's invocation is equivocal or ambiguous. *Davis* instructs,

> "Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. That was the procedure followed by the NIS agents in this case.

Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis*, 512 U.S. at 461-62.

Here, Dorsey's invocation was unequivocal and unambiguous. Therefore, any follow-up questions were not permitted. Detective Wood should have halted any questioning when Dorsey asked to call his lawyer.

¶ 144    Finally, I agree with the majority's rejection of the State's argument that any possible error is harmless beyond a reasonable doubt.

¶ 145    For the foregoing reasons, I would grant Dorsey's motion to suppress and therefore join in the majority's decision to reverse and remand for a new trial.

*People v. Dorsey*, **2023 IL App (1st) 200304**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-13944; the Hon. Ursula Walowski, Judge, presiding. |
| **Attorneys for Appellant:** | Jodi L. Garvey and Patrick W. Blegen, of Blegen & Garvey, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |